**BROEGE, NEUMANN, FISCHER & SHAVER, L.L.C.**
**25 Abe Voorhees Drive**
**Manasquan, New Jersey  08736**
**732-223-8484**
**Attorneys for Petitioning Creditors**
**David E. Shaver, Esq.**
**DS 9825**

UNITED STATES BANKRUPTCY COURT
District of New Jersey

| | |
|---|---|
| In Re: | : |
| | : |
| National Management and | : |
| Preservation Services, LLC | : |
| d/b/a National Field Network, | : |
| | : |
| Debtor. | : |

Chapter 7 Case No.: 18-16859

Judge:  Honorable Christine M. Gravelle

Hearing Date:  To Be Scheduled By The Court

**CERTIFICATION OF GEORGE TEREBINSKY**
**IN SUPPORT OF MOTION, ON SHORT NOTICE, FOR ENTRY OF AN ORDER**
**PURSUANT TO 11 U.S.C. § 303(g) APPOINTING AN INTERIM CHAPTER 7**
**TRUSTEE**

I, George Terebinsky, certify as follows:

1.    I am the President and sole shareholder of Garden State Property Services, Inc. ("GSPS"), one of the three petitioning creditors in the above-captioned Involuntary Chapter 7 Bankruptcy case.   I make this Certification in support of the motion of the petitioning creditors, pursuant to 11 U.S.C. § 303 (g), for entry of an Order Appointing an Interim Chapter 7 Trustee.

2.    Attached as Exhibit A is a copy of the January 26, 2018 letter, General Release, Unconditional Waiver and Release of Liens, and Additional Payment Agreement that GSPS received from Victor Deutch, Esq. on behalf of the Debtor National Management and Preservation Services, LLC d/b/a National Field Network ("the Debtor").

3.      In addition to advising that the Debtor was contemplating seeking relief under the U.S. Bankruptcy Code, and offering a payment of 20 cents on the dollar as an alternative, Mr. Deutch advised in the letter that "effective February 5, 2018 NFN will cease its business operations" (Exhibit A).  Upon information and belief the Debtor has vacated and moved out of 4581 U.S. Highway 9 in Howell, New Jersey since our attempt to serve the Debtor there with the Summons and Involuntary Petition was unsuccessful as the premises are vacant with no business operating there (Exhibit B).

4.      As of April 13, 2018 the website of the Debtor (www.nationalfieldnetwork.com) was still up and running.

5.      As of April 13, 2018 the telephone number of the Debtor (732-276-5563) is still in service and a recorded message advises callers to leave a message "if they have a problem".  The message does not advise that the Debtor is no longer in business, but as of April 13, 2018 the answering system will not accept any messages.

6.      An internet search of the name National Field Network conducted on April 10, 2018 revealed an address of 73 Broad Street in Red Bank, New Jersey for National Field Network.

7.      Attached as Exhibit C is a copy of the civil action that the Debtor filed against Reverse Mortgage Solutions in the Superior Court of the State of New Jersey, Law Division, Monmouth County on March 29, 2018 for collection of a "book account" claim of $5,066,595.43.  Although the 4581 Route 9, Howell, New Jersey address is presently vacant and unoccupied the Debtor's Complaint sets it forth as its business address.

8.      At this point it appears that the Debtor has not actually ceased business operations despite the representations that it would do so as of February 5, 2018.

9.    The attempts by GSPS' attorney in February of 2018 to obtain basic financial information from the Debtor and its attorney necessary to evaluate the Debtor's January 26, 2018 "20 cents on the dollar" proposal were unsuccessful (Exhibit D).  Mr. Deutch's February 19, 2018 letter makes it very clear the Debtor's "20 cents on the dollar" proposal was in the nature of a "take it or leave it" proposition and that the Debtor was unwilling to provide any of the financial and business operations information that GSPS' attorney had requested so as to be able to evaluate and consider the Debtor's "20 cents on the dollar" proposal (Exhibit D).

10.    The Debtor is clearly generally not paying its debts as they come due and, disturbingly, has either ceased business operations or it has not, whichever at that particular time best suits the interest of the Debtor to assert.

11.    As the Debtor's website still proudly proclaims, its business is a nationwide one with a large number of properties serviced throughout the United States.  Much of the Debtor's business was generated through contracts with the Federal Government for servicing properties which Fannie Mae or Reverse Mortgage Solutions owned or was in the process of foreclosing on.  Indeed, all of the work performed by GSPS under its contract with the Debtor, a copy of which is attached hereto as Exhibit E, was with regard to Fannie Mae or Reverse Mortgage Solutions owned properties.

12.    As set forth in the Involuntary Chapter 7 Petition, the Debtor owes GSPS $293,517.40, petitioning Creditor Eleuteria Sandra Hering d/b/a El Paso Construction $284,158.49, and Petitioning Creditor The Cole Team, Inc. $93,604.23.  The aggregate debt owed to the three Petitioning Creditors amounts to $671,280.09, which is not an insignificant sum.  Given the nationwide scope of the Debtor's business and its alleged cessation of business, the amount of the debt owed by the Debtor to contractors and vendors must be vastly

3

greater than the $671,280.09 owed to the three Petitioning Creditors. For example, a Creditor of the Debtor located in Connecticut, PU Preservation/Renovation LLC and Paul Ulloa, filed an action in U.S. District Court for the District of Connecticut against the Debtor on March 22, 2018 seeking over $150,000 for unpaid invoices (Exhibit F).

13.    At this point there is absolutely no clarity as to the true actual financial condition of the Debtor as it has steadfastly refused to be transparent and forthcoming with the Petitioning Creditors, even with regard to whether or not it was still operating. Attached as Exhibit G is a copy of the Complaint for injunctive and other relief that was filed against the Debtor by Reverse Mortgage Solutions on March 5, 2018 in Texas State Court, in which it is alleged that the Debtor continues to use and possess data and business information that is owned by Reverse Mortgage Solutions. Attached as Exhibit H is a copy of the March 15, 2018 Consent Temporary Restraining Order that was entered in that case.

14.    An Interim Chapter 7 Trustee should be appointed to answer the questions of whether or not the Debtor is still actually engaged in business and, if so doing what, and if not still in business what happened to that business and all of its assets. The appointment of an Interim Chapter 7 Trustee to take possession and control of the Debtor's assets is necessary to preserve the Debtor's assets and to protect the interests of all of the Creditors of the Debtor by preventing the possible transfers or dissipation of assets pending the Trial on the Petitioning Creditors' Involuntary Chapter 7 Petition.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

/s/ George Terebinsky
George Terebinsky

Dated: April 13, 2018

# EXHIBIT "A"

# DEUTCH & ASSOCIATES LLC
### COUNSELLORS AT LAW

VICTOR A. DEUTCH

N.J. & N.Y. BARS

EMAIL:
vdeutch@deutchassociates.com

Ext. 208

KISLAK BUILDING
1000 U.S. HIGHWAY 9 NORTH, STE. 204
WOODBRIDGE, N.J. 07095-1200

732.636.4200

FACSIMILE
732.636.7395

www.deutchassociates.com

NEW YORK OFFICE:

305 BROADWAY
14TH FLOOR
NEW YORK, NY 10007

212.822.1424

January 26, 2018

Mr. George Terebinsky
Garden State Property Services Inc.
425 US Highway 9 North
West Creek, NJ 08902

Re:    **National Management and Preservation Services LLC
d/b/a National Field Network: Amount Due: $293,517.40**

Dear Mr. Terebinsky:

We represent National Management and Preservation Services LLC, d/b/a National
Field Network ("NFN").

NFN's relationships with its clients have been terminated. Effective February 5,
2018, NFN will cease its business operations.

NFN's books show the amount above as the account payable to your company. NFN
will not be able pay that amount. Before filing for bankruptcy protection, which will likely
result in funds being used for administrative expenses, other unnecessary costs and
possible secured creditor claims, NFN wants to prioritize its unsecured vendor creditors,
collect the maximum amount possible on its accounts receivable and pay twenty (20%)
percent to each vendor which agrees to provide a Release.

NFN has a large account receivable with a client. That sum is contested and will
likely require litigation to obtain, which NFN will pursue to collect. If successful, from
the sum collected NFN will pay to each vendor agreeing to provide a Release now up to
an additional twenty five (25%) percent of the amount due above. NFN will sign an
Agreement binding it to this proposal, which will specify that the Release provided now
will not prevent your company from receipt of the additional amount.

If your company does not agree to this proposal, the amount set aside for it will be
rolled into the pool and used for the benefit of NFN's other unsecured vendor creditors.

Enclosed with this letter is the General Release and Waiver and Release of Lien
required to be signed, **each in blue ink please**, before a Notary Public, who should also

DEUTCH & ASSOCIATES LLC

Mr. George Terebinsky
January 26, 2018
<u>Page Two</u>

sign each **in blue ink, please**.   Also enclosed with this letter is the Agreement binding
NFN to pay up to an additional twenty five (25%) percent of the amount due above to your
company from the sum collected from its client.  That Agreement specifies that the Release
and Waiver do not prevent your company from receiving its share of those funds.  You
should sign that Agreement, **also in blue ink please**. It does not require a Notary.

　　　Please return the original signed and notarized Release and Waiver and the original
signed Agreement to this firm.  The documents will be held in escrow by us pending full
payment to your company of the amount shown.  That sum will be paid by NFN in four (4)
equal, monthly installments.

　　　Only after your company receives and deposits the fourth (4th) payment will the
Release and Waiver be discharged from escrow and sent to NFN and the original
Agreement, which will be signed by NFN, sent to you.  As an extra protection for your
company, the Release states that it is not binding unless full payment is made.  If we
discharge the Release or the Waiver from the escrow prematurely, we are liable to your
company for doing so.

　　　We can only provide two (2) weeks from the date of this letter for you to decide if
your company will accept NFN's proposal. The same offer is being made to a large number
of creditors and NFN needs to know what funds are available to pay each of them.  If you
do not respond, we will assume the proposal is rejected.  Then, the amount set aside by
NFN for your company will be used for the benefit of other unsecured creditors and no
additional funds will be available. Also, without agreeing now, NFN will have no
obligation to pay your company from any sum collected from NFN's client.

　　　Thank you.

　　　　　　　　　　　　　　　　　　Very truly yours,

　　　　　　　　　　　　　　　　　　DEUTCH & ASSOCIATES LLC

　　　　　　　　　　　　　　　　　　VICTOR A. DEUTCH

VAD:rvl
Enclosures
cc:   NFN, with encls.

**NOTICE: This communication is an attempt to resolve a dispute through
compromise. It does not waive, release, modify or reduce any claims made, possessed
or to be made by NFN.  Nothing in this letter, nor the letter itself, may be offered to,
nor may any portion be recited before any court or other form of tribunal or form of
alternate dispute resolution for any purpose, at any time, without the prior, written
consent of Deutch & Associates LLC.**

## GENERAL RELEASE

This Release dated _____ __ , 2018, is given

BY Releasor(s): Garden State Property Services Inc., a New Jersey Domestic Profit Corporation, and George Terebinsky, its President and CEO, who signs this Release as an accommodating party, both with an address at 425 US Highway 9 North, West Creek, NJ 08902 [all are referred to as "I"]

TO Releasee(s): NATIONAL MANAGEMENT AND PRESERVATION SERVICES, LLC, d/b/a NATIONAL FIELD NETWORK, a Delaware Limited Liability Company, with an address at 4581 US Highway 9, Howell, NJ 07731, REVERSE MORTGAGE SOLUTIONS, INC., 2727 Spring Creek Dr., Spring, TX 77373, FEDERAL NATIONAL MORTGAGE ASSOCIATION, 14221 Dallas Parkway #1000, Dallas, TX 75201 and U.S. BANK NATIONAL ASSOCIATION, 1515 W. 14th Street, Tempe, AZ 85280, as Trustee for MORTGAGE EQUITY CONVERSION ASSET TRUST 2011-1 (MECA Trust 2011-1) (referred to as "You")

1.   **RELEASE.** I release and give up any and claims and rights which I may have against You. This releases all claims, including those of which I am not aware and those not mentioned in this Release. This Release applies to claims resulting from anything which happened up to now, including but not limited to all claims related to outstanding work orders, balances and invoices due for work performed to date.

2.   **PAYMENT.** I have been paid a total of Fifty Eight Thousand Seven Hundred Three and 48/100 ($58,703.48) dollars and other good and valuable consideration, in full payment for making this Release. I agree that I will not seek anything further including any other payment from you. **This Release is void if payment of the above amount, in good funds, is not received.**

3. **ADVICE OF COUNSEL.** I ACKNOWLEDGE THAT I HAD THE OPPORTUNITY TO SEEK ADVICE OF AN ATTORNEY OF MY CHOOSING TO REVIEW THIS RELEASE AND ALL CLAIMS I MAY HAVE. BY SIGNING THIS RELEASE I WAIVE ANY RIGHT TO SEEK ADDITIONAL ADVICE OF AN ATTORNEY. I REPRESENT THAT THE DECISION TO SIGN THIS RELEASE WAS VOLUNTARY AND NOT IN ANY WAY INFLUENCED OR CAUSED BY YOU.

4.   **WHO IS BOUND.**   I am bound by this Release. Anyone who succeeds to my responsibilities and rights, such as my shareholders or successors, is also bound. This Release is made to benefit You and all who succeed to the rights and responsibilities of You, such as the Members, officers, managers, employees, agents, contractors, servants, successors, assigns, administrators and representatives of You.

5.   **SIGNATURES.**   I understand and agree to the terms of this Release. If this Release is made by a corporation or company, its proper officers are authorized to sign and bind it and any corporate seal required shall be presumed as affixed.

Garden State Property Services Inc..
[RELEASOR'S FULL CORPORATE NAME]

By: _____

George Terebinsky, President and CEO
[PRINT NAME AND OFFICE HELD]

_____

George Terebinsky
[PRINT NAME]

## ACKNOWLEDGMENT

STATE OF <u>NEW JERSEY</u>, COUNTY OF _____          SS.:

I CERTIFY that on _____ ___ , 2018, George Terebinsky personally came before me, whose proof of identification was obtained to my satisfaction and who acknowledged under oath, also to my satisfaction, that this person:

(a) is named in and personally signed this document for and as the President and CEO of Garden State Property Services Inc.;

(b) signed, sealed and delivered this document as this person's act and deed on behalf of Garden State Property Services Inc.;

(c) signed, sealed and delivered this document as this person's act and deed individually; and

(d) executed this document under oath, after being duly sworn.

_____

NAME:

NOTARY PUBLIC OF _____

MY COMMISSION EXPIRES: _____

SEAL

## UNCONDITIONAL WAIVER AND RELEASE OF LIEN(S)

On this ____ day of _____, 2018, the undersigned Contractor(s), upon receipt of payment from National Management and Preservation Services, LLC, d/b/a National Field Network ("NFN"), represents and warrants to NFN that: (i) each subcontractor of or material supplier to the undersigned has been paid in full and is not owed any amount for labor, services or materials furnished through the date specified above, (ii) the undersigned indemnifies NFN and any of its designees against liability and costs incurred as a result of and holds them harmless from any claim(s), including but not limited to construction lien claim(s) against any property owned or serviced by or for NFN, made by a subcontractor or material supplier of the undersigned, through the date above, and (iii) the undersigned releases any claim(s) against NFN and waives any right to file a lien for labor, services or materials provided to NFN through the date specified above.

CONTRACTOR:

[NAME] Garden State Property Services Inc.

By:      _____
         [PRINT NAME] George Terebinsky
         [TITLE] President and CEO

         _____
         [PRINT NAME] George Terebinsky

## ACKNOWLEDGMENT

STATE OF NEW JERSEY COUNTY OF                      SS.:

I CERTIFY that on _____ ___, 2018, George Terebinsky personally came before me, whose proof of identification was obtained to my satisfaction and who acknowledged under oath, also to my satisfaction, that this person:

(a) is named in and personally signed this document for and as President and CEO of Garden State Property Services Inc.;

(b) signed, sealed and delivered this document as this person's act and deed on behalf of Garden State Property Services Inc.;

(c) signed, sealed and delivered this document as this person's act and deed individually; and

(d) executed this document under oath, after being duly sworn.

_____
NAME:
NOTARY PUBLIC OF _____
MY COMMISSION EXPIRES: _____              SEAL

## ADDITIONAL PAYMENT AGREEMENT

This Additional Payment Agreement ("Agreement") is effective _____, 2018 between National Management and Preservation Services LLC d/b/a National Field Network ("NFN") and _____ ("Vendor").

## RECITALS

**WHEREAS,** NFN agreed to pay Vendor a sum equal to twenty (20%) percent of the total outstanding amount shown on NFN's records as due to Vendor (the "Settlement Sum");

**WHEREAS,** Vendor provided NFN with a General Release and Unconditional Waiver and Release of Lien, to be held in escrow pending full payment of the Settlement Sum;

**WHEREAS,** Vendor acknowledges that NFN is entering into similar agreements with other creditors;

**WHEREAS,** NFN is pursuing payment of its account receivable from Reverse Mortgage Solutions, Inc. ("RMS") that may generate additional funds (the "RMS Amount");

**WHEREAS,** if and when collected, the RMS Amount may enable NFN to pay creditors additional sums against the amounts due such creditors; and

**WHEREAS,** Vendor's signing of a General Release was based, in part, on NFN's agreement to share with Vendor the net of the RMS Amount collected, up to but not more than twenty five (25%) percent of the total outstanding amount shown on NFN's records as due to Vendor;

**NOW, THEREFORE,** in consideration of the promises made to each other, the adequacy of which both NFN and Vendor acknowledge to be sufficient to support their respective obligations in this Agreement, they agree as follows:

1.      Each of the Recitals above are incorporated into this Agreement as if fully set forth.

2.      Notwithstanding Vendor's General Release, and strictly subject to the terms and conditions of this Agreement, NFN agrees to pay to Vendor an additional amount up to but not to exceed twenty five (25%) percent of the total outstanding amount shown on NFN's records as due to Vendor solely derived from the net of the RMS Amount, if collected. "Net" means that NFN shall first deduct all expenses incurred in collecting the RMS Amount, including but not limited to fees, costs, attorneys' fees, including contingency fees, and any other deductions, the nature and amount(s) of which shall be solely decided by NFN.

3.      Vendor shall have no right to receive from and waives an accounting, any interest in, claim against or right to payment from NFN of any sum of money other than Vendor's share, if any, of the Net of the RMS Amount, if collected, as specified in this Agreement.

4.     If the Net collected from RMS does not equal the total amount NFN is obligated to pay all creditors, Vendor will receive a prorated share [Settlement Sum ÷ all creditor settlement amounts X Net]. Except for disclosing that the Net collected from RMS is insufficient to pay an additional amount equal to twenty five (25%) percent of the total outstanding amount shown on NFN's records as due to Vendor, NFN shall have no obligation to provide Vendor with calculations by which Vendor's prorated share is determined.

5.     This Agreement does not obligate NFN to (a) pursue any account(s) receivable, including the RMS Amount, or (b) provide Vendor with any information about the status of NFN's effort(s) to collect the RMS Amount or (c) pay Vendor more than an additional amount equal to twenty five (25%) percent of the total outstanding amount shown on NFN's records as due to Vendor.

6.     As additional consideration to NFN for entering into this Agreement, Vendor represents that it will not make any inquiries to any NFN customer, including but not limited to RMS and Federal National Mortgage Association ("Fannie Mae"), about (a) NFN or (b) any amount(s) due from such customer to NFN or (c) any amounts due from NFN to Vendor or any other creditor(s) nor disparage, defame, libel or slander, by publication, verbal communications or any other method, NFN or its Member or any of NFN's officers, employees, professional representatives or those of any affiliates of NFN. Any breach of these representations by or on behalf of Vendor, directly or indirectly, will terminate this Agreement and terminate Vendor's right to receive any portion of the Net RMS Amount. In such case, NFN shall have the right to terminate this Agreement by a writing delivered to Vendor by any one of the following methods: (a) e-mail to the designated contact(s), (b) facsimile transmission with confirmation retained, (c) Certified Mail, Return Receipt Requested or (d) overnight delivery by a recognized carrier such as FEDEX. Termination shall be effective upon receipt of the writing by Vendor.

7.     Nothing in this Agreement modifies or changes the terms of the General Release provided to NFN by Vendor except as specifically stated in this Agreement.

8.     This Agreement shall be, in all respects, construed, governed, interpreted and applied pursuant to and in accordance with the laws of the State of New Jersey, including but not limited to the validity of its terms and the interpretation of the rights and duties of the parties hereto.

9.     Any controversies arising under this Agreement or the performance of either party pursuant to this Agreement shall be resolved in accordance with the Streamlined Arbitration Rules & Procedures or the Comprehensive Arbitration Rules & Procedures, whichever applies, of Judicial Arbitration and Mediation Services ("JAMS") at its New York City office, presently at 620 Eighth Avenue, 34th Floor, New York, NY 10018, and the award may be entered in any court(s) having jurisdiction thereof. Except for enjoining the other party from attempting to resolve any controversy before any court or tribunal other than JAMS, neither party may institute any lawsuit or seek arbitration or any other form of conflict resolution other than as stated herein. If a party appears before any tribunal other than JAMS for the purpose of compelling the other party to comply with the resolution requirements stated herein, the party having filed the action

-2-

before such tribunal shall reimburse the other party for all costs and reasonable attorneys' fees incurred to compel arbitration before JAMS and such amount shall be submitted to JAMS in the form of a Certification(s) and incorporated into any final determination, without objection by the other party except as to the amounts stated for such costs and fees.

10.     Vendor and NFN acknowledge that this Agreement sets forth their entire understanding as to its subject matter, supersedes any prior understandings or agreements between them other than the General Release and Unconditional Release and Waiver of Lien, whether written or verbal and cannot be changed or modified except in a writing signed by both Vendor and NFN. Vendor and NFN agree to execute such further documents as may be necessary to carry out the intent and provisions of this Agreement.  The failure of either Vendor or NFN to assert a right or insist on compliance with any term or condition of this Agreement shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition.

11.     The provisions of this Agreement are severable.  If any provision of this Agreement is determined to be invalid or unenforceable under any controlling body of law, such invalidity or unenforceability shall not in any way affect the validity or enforceability of the remaining provisions nor shall such provision be invalid or unenforceable in any other jurisdiction.

12.     This Agreement may be executed in one or more counterparts, each of which is to be considered an original instrument and all of which together shall be considered one and the same Agreement.  Receipt of executed pages by electronic format or facsimile transmission shall constitute, have the same force and effect and be as binding, as if executed and delivered by Vendor and NFN in the presence of each other.

**IN WITNESS WHEREOF,** the Vendor and NFN acknowledge that they have read, understood and consent to all of terms stated herein and have duly executed this Agreement as of the day and year first above written.


National Management and Preservation           Vendor:
Services, LLC, d/b/a National Field Network       [NAME]

By: _____          By: _____
        Christopher Crandell, COO                     Its: _____
                                                      [OFFICE HELD OR TITLE OF
                                                      PERSON SIGNING]

# EXHIBIT "B"





20180409153744

**Guaranteed Subpoena Service, Inc.**
P.O. Box 2248 - Union, New Jersey 07083
(908) 687-0056   (800) 672-1952
Fax: (908) 688-0885 Tax ID 22-2393485
**www.Served.com**

YOUR PROCESS **20180409153744** Was

**NOT SERVED!**

BROEGE, NEUMANN, FISCHER & SHAVER
DAVID E. SHAVER, ESQ.
25 ABE VOORHEES DRIVE
MANASQUAN NJ 08736

NOT Served Date/Time: 4/10/2018 2:52 PM

---

**Visit us at www.SERVED.com to get the latest status of your process. Your FirmID is: D6C593EA**

NOT Served Upon:   NATIONAL MANAGEMENT AND PRESERVATION SERVICES LLC D/B/A NATIONAL FIELD NETWORK
At BUSINESS :   **4581 U.S. HIGHWAY 9, STE 100  HOWELL TWP. NJ 07731**

In the Case/Docket:   **18 16859**  Claim:
Plaintiff:   **IN THE MATTER OF: NATIONAL MANAGEMENT AND PRESERVATION SERVICES LLC. D/B/A NATIONAL FIELD NETWORK**
Defendant:   **N/A**
Attorney:   **DAVID E. SHAVER, ESQ.**  Phone: **7322238484**  Fax: **7322232416**  Email:
Firm:   **BROEGE, NEUMANN, FISCHER & SHAVER**
  **25 ABE VOORHEES DRIVE  MANASQUAN NJ 08736**

# WE MAY BE ABLE TO SERVE YOUR PROCESS IF WE HAVE YOUR AUTHORIZATION TO FURTHER INVESTIGATE THIS MATTER!

---

# AUTHORIZATION FOR ADVANCED SEARCH
### Note: all investigative work is performed by Spartan Detective Agency, NJ License 2392
**To order search check desired box, sign authorization and fax back to us immediately at 888-224-4405**
*PLEASE BE ADVISED THAT IF THE SOCIAL SECURITY NUMBER OR TAX ID IS NEEDED FOR A SEARCH THERE WILL BE A $50 FEE.

[ ] Social Security Search $50 find or no find      [ X ]* Affidavit of Due Diligence $35 NJ only, $50 other states

[ ] Skip Search* - $75.00 - no find, no pay      [ X ] Corporate Search - $85 anywhere in U.S.

[ ] Postal Forwarding $30 anywhere in U.S      [ ] **(SDA)** Stake Out/Inv $125/hr | **(GSS)** - Wait Time $100/hr (NJ)
          $130/hr Out of State **(circle one)** - Auth Hours ____

[ ] DMV - MVC $60 NJ only, $110 other states

_____      ___/___/___
AUTHORIZING SIGNATURE          DATE

---

PLEASE FAX SIGNED AUTHORIZATION TO (888) 224-4405 OR CALL (877) SDA-2009 TO REACH **SPARTAN DETECTIVE AGENCY**
OR CALL (800) 672-1952 TO REACH **GUARANTEED SUBPOENA SERVICE**
We were unable to serve your process for the following reason:

**AT THE GIVEN HOWELL TOWNSHIP, NJ LOCATION SERVER OBSERVED NO BUSINESS AT THE ADDRESS. UNABLE TO EFFECTAUTE SERVICE.**

---

### ***THIS FORM DOES NOT CONSTITUTE A LEGAL DUE DILIGENCE AFFIDAVIT***
**The specific reasons for failure to serve are available from us in an Affidavit Form, Signed and Notarized for $35 in NJ and $50 in all other states.**
**Check the box above and return for the affidavit.**

EXHIBIT "C"

Case Number: MON L-001129-18

Case Caption:  National Management And Prese  Vs Reverse Mortga

| | | |
|---|---|---|
| **Court:** Civil Part | **Venue:** Monmouth | **Case Initiation Date:** 03/29/2018 |
| **Case Type:** Book Account (Debt Collection Matters y) | **Case Status:** Active | **Jury Demand:** None |
| **Case Track:** 1 | **Judge:** Owen C Mccarthy | **Team:** 3 |
| **Original Discovery End Date:** | **Current Discovery End Date:** | **# of DED Extensions:** 0 |
| **Original Arbitration Date:** | **Current Arbitration Date:** | **# of Arb Adjournments:** 0 |
| **Original Trial Date:** | **Current Trial Date:** | **# of Trial Date Adjournments:** 0 |

### Plaintiffs

**National Managementand Preser AKA  National Field Network**

| | |
|---|---|
| **Party Description:** Business | **Attorney Name:** Eric S Deutch |
| **Address Line 1:** 4581 Route 9 | **Address Line 2:** Suite 100 | **Attorney Bar ID:** 004812010 |
| **City:** Howell   **State:** NJ | **Zip:** 07731 | **Phone:** |
| **Attorney Email:** EDEUTCH@DEUTCHASSOCIATES.COM | | |

### Defendants

**Reverse Mortgage Solutions Inc**

| | |
|---|---|
| **Party Description:** Business | **Attorney Name:** |
| **Address Line 1:** 14405 Walters Road | **Address Line 2:** Suite 200 | **Attorney Bar ID:** |
| **City:** Houston   **State:** TX | **Zip:** 77014 | **Phone:** |
| **Attorney Email:** | | |

### Case Actions

| Filed Date | Docket Text | Transaction ID | Entry Date |
|---|---|---|---|
| 3/29/2018 | Complaint for MON-L-001129-18 submitted by DEUTCH, ERIC S, DEUTCH & ASSOCIATES LLC on behalf of NATIONAL MANAGEMENT AND PRESER against REVERSE MORTGAGE SOLUTIONS INC | LCV2018562050 | 3/29/2018 |
| 3/30/2018 | TRACK ASSIGNMENT submitted by Case Management | LCV2018563037 | 3/30/2018 |

**Victor A. Deutch—008891973**
**Eric S. Deutch—004812010**
**DEUTCH & ASSOCIATES** LLC
1000 U.S. Highway 9 North, Suite 204
Woodbridge, New Jersey 07095
(732) 636-4200
*Attorneys for Plaintiff*

|  |  |
|---|---|
| ————————————————X | |
| NATIONAL MANAGEMENT AND : | SUPERIOR COURT OF NEW JERSEY |
| PRESERVATION SERVICES LLC : | LAW DIVISION: MONMOUTH COUNTY |
| : | |
| Plaintiff, : | DOCKET NO.: |
| : | |
| vs. : | CIVIL ACTION |
| : | |
| REVERSE MORTGAGE SOLUTIONS, INC.: | **COMPLAINT** |
| : | |
| Defendant. : | |
| ————————————————X | |

      Plaintiff, National Management and Preservation Services LLC ("NMPS"), a Delaware

Limited Liability Company, doing business in New Jersey as National Field Network, with an

address at 4581 Route 9, Suite 109, Howell, N.J. 07731, by way of Complaint against defendant,

Reverse Mortgage Solutions, Inc. ("RMS"), with an address at 14405 Walters Road, Suite 200,

Houston, TX 77014, says:

## FIRST COUNT

      1.     NMPS was engaged in the business of providing property maintenance

and preservation services and inspections.

      2.     RMS sent requests to NMPS in New Jersey for property maintenance and

preservation services and inspections (the "RMS Services").

      3.     NMPS provided RMS the requested RMS Services in, among other places, New

Jersey.

      4.     RMS received invoices generated by NMPS from New Jersey.

5.     RMS sent NMPS payments to New Jersey.

6.     RMS owns properties in New Jersey.

7.     RMS has conducted and continues to conduct business in New Jersey.

8.     On information and belief, RMS has availed itself of the New Jersey Courts.

9.     This Court has personal jurisdiction over RMS.

10.    NMPS provided to RMS the RMS Services.

11.    Before July 27, 2015, NMPS rendered services to RMS for which RMS owes NMPS the sum of Two Thousand Two Hundred and 00/100 ($2,200.00) dollars.

12.    Despite demand having been made by NMPS to RMS for payment, the entire balance remains due and owing.

13.    There remains due to NMPS from RMS the sum of Two Thousand Two Hundred and 00/100 ($2,200.00) dollars on the book account.

**WHEREFORE**, plaintiff, National Management and Preservation Services LLC, demands judgment against defendant, Reverse Mortgage Solutions, Inc., for the sum of Two Thousand Two Hundred and 00/100 ($2,200.00) dollars, together with interest, attorneys' fees, costs of suit and such other and further relief as the Court deems proper and equitable.

## SECOND COUNT

1.     NMPS repeats and reiterates each and every allegation set forth in the First Count of the Complaint as if recited at length herein.

2.     Between July 27, 2015 and July 27, 2017, NMPS rendered services to RMS for which RMS owes NMPS the sum of Three Million Two Hundred Ninety Two Forty Eight and 89/100 ($3,292,048.89) dollars.

3.    Despite demand having been made by NMPS to RMS for payment, the entire balance remains due and owing.

4.    There remains due to NMPS from RMS the sum of Three Million Two Hundred Ninety Two Forty Eight and 89/100 ($3,292,048.89) dollars on the book account.

**WHEREFORE**, plaintiff, National Management and Preservation Services LLC, demands judgment against defendant, Reverse Mortgage Solutions, Inc., for the sum of Three Million Two Hundred Ninety Two Forty Eight and 89/100 ($3,292,048.89) dollars, together with interest, attorneys' fees, costs of suit and such other and further relief as the Court deems proper and equitable.

## THIRD COUNT

1.    NMPS repeats and reiterates each and every allegation set forth in the First Count of the Complaint as if recited at length herein.

2.    Between July 28, 2017 and February 5, 2018, NMPS rendered services to RMS for which RMS owes NMPS the sum of One Million Seven Hundred Seventy Two Three Hundred Forty Six and 54/100 ($1,772,346.54) dollars.

3.    Despite demand having been made by NMPS to RMS for payment, the entire balance remains due and owing.

4.    There remains due to NMPS from RMS the sum of One Million Seven Hundred Seventy Two Three Hundred Forty Six and 54/100 ($1,772,346.54) dollars on the book account.

**WHEREFORE**, plaintiff, National Management and Preservation Services LLC, demands judgment against defendant, Reverse Mortgage Solutions, Inc., for the sum of One Million Seven Hundred Seventy Two Three Hundred Forty Six and 54/100 ($1,772,346.54)

dollars, together with interest, attorneys' fees, costs of suit and such other and further relief as the Court deems proper and equitable.

## FOURTH COUNT

1.      NMPS repeats and reiterates each and every allegation set forth in the First, Second and Third Counts of the Complaint as if recited at length herein.

2.      NMPS sues RMS for monies due and owing for services rendered in reliance upon RMS's promise to pay.

3.      NMPS has demanded payment from RMS for Five Million Sixty Six Thousand Five Hundred Ninety Five and 43/100 ($5,066,595.43) dollars, but RMS has refused to pay.

4.      There remains due to NMPS from RMS the sum of Five Million Sixty Six Thousand Five Hundred Ninety Five and 43/100 ($5,066,595.43) dollars on the book account.

**WHEREFORE**, plaintiff, National Management and Preservation Services LLC, demands judgment against defendant, Reverse Mortgage Solutions, Inc., for the sum of Five Million Sixty Six Thousand Five Hundred Ninety Five and 43/100 ($5,066,595.43) dollars, together with interest, attorneys' fees, costs of suit and such other and further relief as the Court deems proper and equitable.

## FIFTH COUNT

1.      NMPS repeats and reiterates each and every allegation set forth in the First, Second, Third and Fourth Counts of the Complaint as if recited at length herein.

2.      NMPS sues RMS for the reasonable value of services provided upon RMS's promise to pay.

3.      The amount of Five Million Sixty Six Thousand Five Hundred Ninety Five and 43/100 ($5,066,595.43) dollars is the reasonable value of such services.

4        There remains due to NMPS from RMS the sum of Five Million Sixty Six

Thousand Five Hundred Ninety Five and 43/100 ($5,066,595.43) dollars.

**WHEREFORE**, plaintiff, National Management and Preservation Services LLC,

demands judgment against defendant, Reverse Mortgage Solutions, Inc., for the sum of Five

Million Sixty Six Thousand Five Hundred Ninety Five and 43/100 ($5,066,595.43) dollars,

together with interest, attorneys' fees, costs of suit and such other and further relief as the Court

deems proper and equitable.

<u>**SIXTH COUNT**</u>

1.        NMPS repeats and reiterates each and every allegation set forth in the First,

Second, Third, Fourth and Fifth Counts of the Complaint as if recited at length herein.

2.        RMS received the benefit of services from NMPS without payment thereof.

3.        RMS obtained an unjust enrichment, the value of which is Five Million Sixty Six

Thousand Five Hundred Ninety Five and 43/100 ($5,066,595.43) dollars, by its refusal to pay the

amount due and owing to NMPS.

4        There remains due to NMPS from RMS the sum of Five Million Sixty Six

Thousand Five Hundred Ninety Five and 43/100 ($5,066,595.43) dollars.

**WHEREFORE**, plaintiff, National Management and Preservation Services LLC,

demands judgment against defendant, Reverse Mortgage Solutions, Inc., for the sum of Five

Million Sixty Six Thousand Five Hundred Ninety Five and 43/100 ($5,066,595.43) dollars,

together with interest, attorneys' fees, costs of suit and such other and further relief as the Court

deems proper and equitable.

### SEVENTH COUNT

1.    NMPS repeats and reiterates each and every allegation set forth in the First,

Second, Third, Fourth, Fifth and Sixth Counts of the Complaint as if recited at length herein.

2.    NMPS provided services to RMS in good faith.

3.    RMS accepted the services provided by NMPS.

4.    NMPS reasonably expected to be paid for the services provided.

5.    The value sought for the services provided by NMPS is reasonable.

6.    The reasonable value for the services provided by NMPS to RMS is Five Million

Sixty Six Thousand Five Hundred Ninety Five and 43/100 ($5,066,595.43) dollars.

WHEREFORE, plaintiff, National Management and Preservation Services LLC,

demands judgment against defendant, Reverse Mortgage Solutions, Inc., for the sum of Five

Million Sixty Six Thousand Five Hundred Ninety Five and 43/100 ($5,066,595.43) dollars,

together with interest, attorneys' fees, costs of suit and such other and further relief as the Court

deems proper and equitable.

### EIGHTH COUNT

1.    NMPS repeats and reiterates each and every allegation set forth in the First,

Second, Third, Fourth, Fifth, Sixth and Seventh Counts of the Complaint as if recited at length

herein.

2.    NMPS is entitled to prejudgment interest.

WHEREFORE, plaintiff, National Management and Preservation Services LLC,

demands judgment against defendant, Reverse Mortgage Solutions, Inc., for the sum of Five

Million Sixty Six Thousand Five Hundred Ninety Five and 43/100 ($5,066,595.43) dollars,

together with pre-judgment interest, attorneys' fees, costs of suit and such other and further relief as the Court deems proper and equitable.

## NINTH COUNT

1.     NMPS repeats and reiterates each and every allegation set forth in the First, Second, Third, Fourth, Fifth, Sixth and Seventh Counts of the Complaint as if recited at length herein.

2.     RMS's refusals to pay NMPS were and continue to be willful, wanton and in reckless disregard to the rights of NMPS.

3.     As a result, NMPS is entitled to punitive damages.

**WHEREFORE**, plaintiff, National Management and Preservation Services LLC, demands judgment against defendant, Reverse Mortgage Solutions, Inc., for punitive damages, together with attorneys' fees, costs of suit and such other and further relief as the Court deems proper and equitable.

## TENTH COUNT

1.     NMPS repeats and reiterates each and every allegation set forth in the First Count of the Complaint as if recited at length herein.

2.     RMS was the foreclosing creditor of a property located at 33 Walnut Street, Pompton Lakes, NJ 07442 (the "Property").

3.     RMS did not appoint an in State representative or agent to act on its behalf nor provide the name, address and telephone number of such representative to the Clerk of the Borough of Pompton Lakes.

4.      RMS violated Pompton Lakes Ordinance No. 2016-06 and Pompton Lakes Municipal Code §2-3.3.

5.      On July 25, 2016, RMS requested NMPS to provide specific services at the Property.

6.      On July 21, 2017, Pompton Lakes issued a violation notice to NMPS regarding the Property.

7.      NMPS notified RMS about the violation.

8.      On August 7, 2017, NMPS requested that RMS confirm when the approval for the work required to cure the violation would be obtained.

9.      On August 17, 2017, RMS requested NMPS to provide specific services at the Property.

10.      On August 29, 2017, RMS issued a Work Order to NMPS regarding the Property.

11.      On September 7, 2017, RMS issued a different Work Order to NMPS regarding the Property, reducing the amount to be paid for the services required.

12.      RMS did not authorize payment to NMPS for the services required at the Property.

13.      RMS did not cure the violation issued by Pompton Lakes regarding the Property.

14.      A Summons and Complaint was issued to and served on the Chief Executive Officer of NMPS on or about October 6, 2017.

15.      NMPS had to retain counsel and, among other things, appear before the Pompton Lakes Municipal Court on November 21, 2017.

16.     As a result of that appearance, a Summons and Complaint was issued to NMPS on November 21, 2017.

17.     NMPS incurred costs and fees of Three Thousand Two Hundred Thirty Four and 15/100 ($3,234.15) dollars to respond to both Summonses and Complaints and appear before the Pompton Lakes Municipal Court.

18.     The costs and fees incurred by NMPS were the result of RMS' action(s) or omission(s).

19.     NMPS is entitled to be reimbursed by RMS.

**WHEREFORE**, plaintiff, National Management and Preservation Services LLC, demands judgment against defendant, Reverse Mortgage Solutions, Inc., for the sum of Three Thousand Two Hundred Thirty Four and 15/100 ($3,234.15) dollars, together with interest, attorneys' fees, costs of suit and such other and further relief as the Court deems proper and equitable.

DEUTCH & ASSOCIATES LLC
Attorneys for Plaintiff

By: _____
        VICTOR A. DEUTCH

Dated: March 29, 2018

## DESIGNATION OF TRIAL COUNSEL

Pursuant to **R**. 4:25-4, Deutch and Associates LLC hereby designates Eric S. Deutch, Esq., as trial counsel.

DEUTCH & ASSOCIATES LLC
Attorneys for Plaintiff

By: _____
        VICTOR A. DEUTCH

Dated: March 29, 2018

## CERTIFICATION PURSUANT TO RULE 4:5-1

Pursuant to **R**. 4:5-1, we hereby certify that there are no other actions between these

parties pertaining to the matter in controversy which is the subject of this litigation, to the best

of our knowledge and belief, except for a matter entitled *Reverse Mortgage Solutions, Inc. vs.*

*National Management and Preservation Services, LLC d/b/a National Field Network*, venued

before the District Court of Harris County, Texas [Cause No. 2018-14785], which seeks

injunctive relief and to compel NMPS to arbitrate the amount claimed in the Second Count of the

Complaint. Also, to the best of our knowledge and belief, no other action or arbitration

proceeding is contemplated. Further, other than the parties set forth in this pleading, at this time

we know of no other parties that could or should be joined in the above action. In addition, we

recognize the continuing obligation of each party to file and serve on all parties and the Court an

amended Certification if there is a change in the facts stated in this original Certification.

DEUTCH & ASSOCIATES LLC
Attorneys for Plaintiff

By: _____
VICTOR A. DEUTCH

Dated: March 29, 2018

-10-

# Civil Case Information Statement

## Case Details: MONMOUTH | Civil Part Docket# L-001129-18

**Case Caption:** NATIONAL MANAGEMENT  AND PRESE
VS REVERSE MORTGA

**Case Initiation Date:** 03/29/2018

**Attorney Name:** ERIC S DEUTCH

**Firm Name:** DEUTCH & ASSOCIATES LLC

**Address:** 1000 US HIGHWAY 9 NORTH STE 204

WOODBRIDGE NJ 070953699

**Phone:**

**Name of Party:** PLAINTIFF : National Management and
Preser

**Name of Defendant's Primary Insurance Company**
(if known): Unknown

**Case Type:** BOOK ACCOUNT (DEBT COLLECTION MATTERS
ONLY)

**Document Type:** Complaint

**Jury Demand:** NONE

**Hurricane Sandy related?** NO

**Is this a professional malpractice case?** NO

**Related cases pending:** YES

**If yes, list docket numbers:** Texas Cause No.: 2018-14785

**Do you anticipate adding any parties (arising out of same
transaction or occurrence)?** NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Business

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual
management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
   **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
   **If yes, for what language:**

I certify that confidential personal identifiers have been redacted from documents now submitted to the
court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

03/29/2018
Dated

/s/ ERIC S DEUTCH
Signed

# EXHIBIT "D"

# DEUTCH & ASSOCIATES LLC

COUNSELLORS AT LAW

VICTOR A. DEUTCH

N.J. & N.Y. BARS

EMAIL:
vdeutch@deutchassociates.com

Ext. 208

1000 U.S. HIGHWAY 9 NORTH, STE. 204
WOODBRIDGE, N.J. 07095-1200

732.636.4200

FACSIMILE

732.636.7395

www.deutchassociates.com

NEW YORK OFFICE:

305 BROADWAY
14TH FLOOR
NEW YORK, NY 10007

212.822.1424

February 19, 2018

**VIA EMAIL:** rgutman@cldds.com
**ORIGINAL VIA U.S.P.S.**

Robert L Gutman, Esq.
Carluccio, Leone, Dimon, Doyle & Sacks, L.L.C.
The Law Center of Ocean County
9 Robbins Street
Toms River, NJ 08753

Re:    **Garden State Property Services, Inc. v. National Management and Preservation Services, LLC d/b/a National Field Network**

Mr. Gutman,

This acknowledges receipt of your February 5, 2018 letter.

As for the items listed in your letter:

• I am not aware of balance sheets or profit and loss statements maintained by NFN. I am advised that it does not issue annual reports.

• I am advised that NFN files no federal income tax returns.

• I am advised that the amounts reflected on the A/R Report for Reverse Mortgage Solutions, Inc. are being updated and are no longer current.  As we are in the process of negotiating with RMS, it would not be beneficial to vendors if we provided any amounts at this time to anyone other than RMS.

• I am not able to provide you with an accounts payable ledger at this time, since NFN is in the process of confirming which vendors amounts are due and the outstanding amounts due those vendors.  As we are in the process of negotiating with NFN's vendors, it would not be beneficial to provide amounts at this time to anyone other than each vendor.

## DEUTCH & ASSOCIATES LLC

Robert L Gutman, Esq.
February 19, 2018
Page Two

- numerous vendors have accepted the same proposal, but we are not at liberty at this time to disclose their names. No sums have yet been paid to those accepting the proposal as the initial 30 day period(s) have not been reached, but it is NFN's intention to pay vendors accepting the proposal as stated in the letter and attached documents.

Thank you.

Very truly yours,

DEUTCH & ASSOCIATES LLC

VICTOR A. DEUTCH

VAD:rvl
cc: NFN, w/encls.

**NOTICE: This communication is an attempt to resolve a dispute through compromise. It does not waive, release, modify or reduce any claims made, possessed or to be made by NFN. Nothing in this letter, nor the letter itself, may be offered to, nor may any portion be recited before any court or other form of tribunal or form of alternate dispute resolution for any purpose, at any time, without the prior, written consent of Deutch & Associates LLC.**

# CARLUCCIO, LEONE, DIMON, DOYLE & SACKS, L.L.C.

## A Professional Limited Liability Company
### COUNSELLORS AT LAW
### The Law Center of Ocean County
### 9 Robbins Street
### Toms River, NJ 08753
### (732) 797-1600    Fax: (732) 797-1690
Web site: cldds.com    e-mail: rgutman@cldds.com

Stephan R. Leone©±
Edward J. Dimon†
John Paul Doyle
Robert L. Gutman±
Neil Brodsky©
Ronald E. Prusek□#
Annemarie Schreiber⊕∆
Jonathan Z. Petro
Marguerite Kneisser©
Peter M. Draper
Danielle A. Rosiejka□

*Of Counsel*
Joseph J. La Costa
Vincent J. Grasso⊠, Ret. A.J.S.C.
Howard Butensky
Melanie Szuba Appleby
Gary Ahladianakis©±

©Also admitted in NY
† Also admitted in MA
± Also admitted in DC
□ Also admitted in PA
⊠*Rule* 1:40 qualified Mediator
⊕Member of NAELA, National
Academy of Elder Law Attorneys
∆Certified Elder Law Attorney
#Member of NJAPM, New Jersey
Association of Professional
Mediators
ØMember, American Arbitration
Association

----

In Memoriam

Richard K. Sacks
Daniel J. Carluccio

February 5, 2018

*Celebrating*
1997  **20**  2017
YEARS

Victor A. Deutch, Esq.
Deutch & Associates, LLC
1000 U.S. Highway 9 North, Suite 204
Woodbridge, NJ 08095-1200

Re:    Garden State Property Services, Inc. v. National Management Preservation
Services, LLC d/b/a National Financial Network

Mr. Deutch:

Please be advised that this office represents the interests of Garden State Property
Services, Inc. (hereinafter "GSPS") with regard to the above reference matter. Receipt is
acknowledged of your letter of January 26, 2018 acknowledging the sum due and
outstanding by your client National Management and Preservation Service, LLC doing
business as National Field Network (hereinafter "NFN") in the amount of $293,517.40 for
services performed by GSPS and offering a substantially reduced sum in compromise of
the same due to the purported financial condition of your client. As I recently advised, the
address used for my client in your letter is incorrect and the undersigned only received the
same following a recent call to your office. I would therefore request that all future
communications and correspondence to my client be forward to the undersigned.

With regard to the proposal contained in your letter, in order for my client to make
an informed decision with regard to same, it is imperative that it receive the following
financial information of NFN:

- last three (3) years balance sheets, profit and loss statements, and annual reports
- last three (3) years federal income tax returns
- most recent accounts receivable report which document shall identify the "large
  account receivable client" and the amount owed as referenced in your letter

# CARLUCCIO, LEONE, DIMON, DOYLE & SACKS, L.L.C.

February 6, 2018
Page -2-

- most recent accounts payable report which document shall identify all unsecured vendor creditors referenced in your letter
- identify all unsecured vendor creditors who have accepted the similar proposal contained your letter and any sums paid to date in compromise thereunder.

Demand is hereby made that the above documents be provided no later than fourteen (14) days of the date of this letter. Once received and reviewed, my client will be in a better position to respond to your inquiry and proposal.

Regrettably, should NFN fail and refuse to timely respond to my client's demand for disclosure of the aforesaid financial documents, my client will have no alternative but to pursue all remedies available under the law including, but not limited to, immediately instituting suit in the Superior Court of New Jersey and/or commencing an involuntary bankruptcy against NFN under 11 USC §303. It is hoped that your client will accede to GSPS' request and support the contentions contained in your letter. I look forward to hearing from you shortly. Should you have any questions or wish to discuss this matter, please do not hesitate to contact the undersigned.

Very truly yours,

ROBERT L. GUTMAN

RLG/alf
cc:    Garden State Property Services, Inc.

# EXHIBIT "E"

# NATIONAL FIELD NETWORK

## CONTRACTOR AGREEMENT

This Contractor Agreement ("Contract") is entered into on _March 8_ 20 _16_ between National Management and Preservation Services, LLC, a Delaware Limited Liability Company, doing business as National Field Network, 4581 Route 9, Suite 109, Howell, NJ 07731 (referred to as "NFN"), and

_Garden State Property Services, Inc_

(FULL NAME OF CONTRACTOR, TYPE OF ENTITY [EX: INC. OR LLC] AND STATE IN WHICH ESTABLISHED)

("Contractor" or "Field Technician")

_2 Hollywood Blvd Suite 7   Fair Lawn NJ 08771_

(STREET ADDRESS)                     (CITY)                     (STATE AND ZIP CODE)

## RECITALS

I.      NFN desires to have certain services performed with respect to real properties; and

II.     Contractor represents that it has the ability to perform such services and desires to provide such services to NFN under the terms and conditions stated in this Contract.

**Now, therefore,** for adequate consideration to support the promises, terms and conditions contained in this Contract, the receipt of which is acknowledged, both parties hereby agree to each of the following:

1.      Contractor shall promptly and diligently provide all services requested through work orders issued by NFN for maintenance, inspection(s) and preservation work, within the time requirements requested by NFN, only on properties as specifically identified to Contractor by NFN and not on any other properties or locations. Once work is assigned, responsibility for performance and all ramifications for nonperformance are assumed by Contractor. In addition to completion standards as otherwise described herein, including Section 8 below and in the Field Technician memos, if any work assigned is not completed within five (5) days, NFN at its discretion may assign the work to another firm and back-charge Contractor all costs associated with or resulting from the reassignment. Contractor has full ability and willingness to cover any and all geographic areas as represented by Contractor (the "Coverage Area"), and will accept any work orders as assigned by NFN in these areas in accordance with this Contract. The Coverage Area can only be reduced upon 30-days advance notice by Contractor to NFN. Any change in the Coverage Area or rejection of work by Contractor may engender reductions in work assigned to Contractor by NFN in its sole discretion.

2.      Contractor represents and agrees that NFN may rely on Contractor possessing and utilizing the required knowledge and experience in real property field service(s), inspection(s), preservation and related work to perform tasks requested by NFN, and that Contractor shall be deemed similarly qualified by any NFN customer or vendor. If any NFN customer or vendor charges NFN any fee to evaluate or qualify Contractor, Contractor shall fully reimburse NFN upon receipt of a request. Contractor agrees to furnish a completed background check form to NFN and authorizes NFN to conduct a background check per the guidelines of the Fair Credit Reporting Act (FCRA)[15 U.S.C.§ 1681 et seq.].

1

3.  Contractor agrees to defend, indemnify and hold harmless NFN, any owner or mortgagee secured by property on which or other party for which Contractor performs or fails to perform services through NFN from any proceeding(s) by which NFN seeks (i) to defend itself or any NFN customers or (ii) obtain discharge of any lien(s) or encumbrance(s) filed, recorded or placed against or on real or personal property concerning any and all actions arising from: (1) any act, omission or negligence by Contractor or any employee, agent, servant, representative, subcontractor, outside service provider hired by Contractor, or non-employed individual (hereinafter referred to as "Agent" or "Agents") or other person or entity acting for or capable of binding Contractor; (2) any accident, injury or damage of any kind caused to a person(s) or property, resulting or claimed to have resulted from an act or omission of Contractor or any Agent or other person or entity acting for or capable of binding Contractor; (3) any encumbrance(s), lien(s) of any kind placed on any real or personal property by any Agent or other person or entity acting for or capable of binding Contractor or by or on behalf of any vendor of Contractor, and; (4) any act, omission or default by Contractor or under any of Contractor's obligations pursuant to this Contract. This duty includes, but is not limited to, all costs, expenses, fines, penalties, liabilities and reasonable attorneys' fees NFN incurs or is requested to reimburse to any NFN customer(s). If a lien(s) or encumbrance(s) is filed against any real or personal property as a result of the conduct of Contractor, any Agent or other person or entity acting for Contractor or if NFN incurs costs, expenses, fines, penalties, liabilities or reasonable attorneys' fees in connection with any claim(s), encumbrance(s), lien(s) or any proceeding(s), NFN may pay the amount to discharge such encumbrance(s), claim(s) or lien(s), plus all costs incurred, and deduct the amount(s) from monies due to Contractor.

4.  Contractor shall be solely responsible for the manner or method by which its Agents perform services and the manner and amount of compensation paid for services and labor of Contractor's Agents.

    A.  Contractor is solely responsible for the timeliness, adequacy, quality and safety of all services by Contractor's Agents and for all consequences, including damage to property and injury to third parties, resulting from such performance. Performance or non-performance by any of Contractor's Agents is that of the Contractor. Contractor shall take any/all steps per industry and prudent practice to protect any Agent of Contractor or other person, authorized or unauthorized, who may be present at a work site with, or related to any visit by, Contractor or any if its Agents.

    B.  Contractor acknowledges that all services shall comply with the Fair Debt Collection Practices Act [15 USC 1601 *et seq.*] (FDCPA), particularly regulations and rules promulgated, including those for hours, days and other limits imposed on communications. Contractor represents that it will make every effort in hiring processes, conduct thorough background investigations and use diligent reference checking practices prior to hiring to ensure its Agents possess appropriate character, disposition and honesty. Contractor shall obtain disclosure and authorization from its Agents to satisfy the requirements of the FDCPA and represents to NFN that it has and will continue to do so with each Agent. Contractor is solely responsible for the satisfaction of all USCIS Form I-9, immigration requirements, and other requirements for its Agents.

    C.  Notwithstanding anything contained in section 5 below to the contrary, Contractor is strictly prohibited from using any other contractor(s), outside service provider(s) or non-employed individual(s) to perform any obligations under this Contract. An exception to this requirement may be made only under the following circumstances: the Work Order requires work that must be performed by a licensed contractor per the laws of that locality, the Contractor does not have the

2

required licensed personnel, and the Contractor receives approval for the specific work from NFN and explicitly reflects that in the submitted results. However, in no event shall any work or support functions under this Contract be performed at a facility outside the United States.

D.   Notwithstanding anything contained in section 3 above, if any other contractor(s), outside service providers or non-employed individuals files any lien(s) or encumbrance(s) against any real or personal property concerning any services Contractor was to or did provide for NFN, Contractor shall immediately [not later than five (5) calendar days after such filing] post a proper form of bond securing the amount claimed due and obtain the full discharge of the lien(s) or encumbrance(s) at Contractor's sole cost.

5.   Contractor acknowledges (i) being independent from and not an Agent, partner, joint venturer or customer of NFN, (ii) that Contractor's Agents are not employees of and not entitled to disability, medical, retirement or any other benefits or workers' compensation coverage from NFN, (iii) that NFN will pay a fixed amount per service requested, not by any time measured basis or based on profit or loss from each service provided to NFN and (iv) Notwithstanding anything contained in section 4C above, Contractor may hire Agents as Contractor desires and determine the amount and basis by which each is to be paid, shall provide all necessary tools and equipment, provide and assure that all Agents carry proper, required identification to all locations at all times and set the schedule for completing NFN's requested services on time, in full compliance with and within NFN's guidelines. Contractor shall maintain insurance pursuant to the requirements stated in **Exhibit A** to this Contract, which are incorporated into and made part hereof. If such insurance is not current and in force with documentary proof provided to NFN, NFN's obligations under this Contract shall be deemed suspended as of that time until such insurance is effective and proof provided.

6.   NFN may freely engage other contractors to perform similar services to those performed or provided by Contractor. Contractor may freely perform similar services for others. Nothing in this Contract obligates either NFN or Contractor to act exclusively for or retain only the services of the other.

7.   Except as may be otherwise provided herein, Contractor and NFN agree that Contractor will perform services at a discounted rate of twenty-five percent (25%) as applied to the allowed billable rates as set from time to time or from databases or other authoritative sources as approved by the applicable NFN Client or governing authority as of the date services are performed by Contractor.

8.   NFN will endeavor to pay for all work within thirty-five (35) calendar days provided the work is in full compliance with the following: (i) timely performed and properly and entirely completed pursuant to NFN's Work Order(s) and standards; (ii) entirely reported and documented results uploaded to the NFN system per the Work Order, and; (iii) fully invoiced by Contractor. NFN has the right to deduct ten percent (10%), per day that completed results are uploaded late, from any fee(s) due if Contractor's result(s) or services were not compliant as described herein. However, if Contractor submits a property inspection outside of the time frames described, e.g. in Field Technician Memo 2015-17 "72-Hour Invoicing", but that is otherwise compliant and sufficient to constitute a claimable inspection, NFN may pay Contractor a fee of three dollars ($3.00) for the inspection.

9.   NFN provides Contractor with specific work order and billing information, updated daily and available on the NFN network, within the Contractor section of the NFN system and/or by other means. This reporting

3

documents the basis of all payment(s) to Contractor as provided herein. Contractor has a maximum of 120 calendar days, from the latter of the payment date, cancellation date or notification date of any adjustments to the amount paid, to dispute in writing, within the Contractor section of the NFN system and/or by other means, any payment amount or withholding of payment; after such period payment as reflected in the reporting may be considered final by NFN in its sole discretion. Notwithstanding any applicable late fees as described, NFN has the right to withhold payment for non-compliant work or results from any amounts due Contractor pursuant to this Contract, to reassign the work, and to back charge Contractor for any and all amounts incurred by NFN to rectify the work.

10. Contractor agrees that, in order to perform services for NFN, Contractor will have access to confidential and proprietary information of NFN (e.g. technology utilized by NFN regarding the nature of its services, concepts, ideas and designs, its business plans, marketing plans, vendors, customer names and addresses and sources, pricing, financial information regarding NFN or any customer(s), strategies and trends concerning the operations and business of NFN and to certain trade secrets, on all of which Contractor acknowledges NFN depends and relies.

A. Contractor acknowledges NFN's confidential and proprietary information, that, if revealed to any outside source(s), the disclosure would adversely affect NFN's business and that such information is of such nature as to make it reasonable to restrict Contractor's use thereof to protect NFN's business. Contractor agrees not to make known or make use for Contractor's benefit or the benefit of any person or entity other than NFN, or divulge, reveal, disclose or give any of NFN's confidential and proprietary information, for any reason, including but not limited to fulfilling any objectives of this Contract or to generate revenue for Contractor, while providing or after providing services requested by NFN or required as part of Contractor's independent activities for NFN, except for disclosure to NFN's Agents who themselves have access to such confidential and proprietary information or as authorized in writing by NFN, which authorization shall not be unreasonably denied in the event such disclosure is, in NFN's sole view, required.

B. Contractor shall use all reasonable efforts to preserve and maintain NFN's confidential and proprietary information to the greater degree of care either (i) employed by Contractor as to Contractor's confidential and proprietary information or (ii) reasonably used by others to preserve and safeguard confidential and proprietary information.

C. Contractor agrees not to cause NFN to violate its agreements with its customers as it relates to confidential and proprietary information. NFN relies on Contractor's representation that Contractor shall take all necessary steps to ensure that all Agents adhere to these agreements about confidential and proprietary information.

D. Contractor agrees that, as consideration to NFN for providing access to NFN's confidential and proprietary information, Contractor will not compete with NFN as to, or solicit business from, NFN's existing customers or potential customers with whom/which Contractor came into contact during the term of this Contract, even if Contractor was aware of any such existing or potential customer(s) prior to the term of this Contract, such non-compete period to include both the term of this Contract and a period of two (2) years following the expiration or termination of this Contract, regardless of reason.

4

E. NFN's confidential and proprietary information shall remain the property of NFN. Contractor's obligations hereunder to protect confidential and proprietary information will survive and continue after termination of this Contract.

11. Contractor shall comply with all State, Federal and municipal laws, regulations and guidelines pertaining to business licensing and services performed for NFN, acknowledges that submitting invoices for work not done violates those laws and is fraudulent and that NFN may hold back any amounts due for any work performed under this Contract upon discovery of any invoice issued by Contractor for work not done.

12. Contractor acknowledges that NFN has a zero tolerance policy on theft and that:

A. Allegations of theft will be investigated with the strongest measures possible.

B. Any Contractor(s) or any of its Agents involved in the unauthorized removal of any items from a property will result in immediate suspension of that Contractor pending an investigation, and reassignment of all work.

C. Proper authorities will be contacted to investigate allegations and, based on the outcome of an investigation, action will be taken up to and including relationship termination and criminal prosecution referrals.

D. Theft includes, but is not limited to, the removal of any items from a property that is not specified by the NFN work order. This includes permitting Agents, neighbors, or anyone else to take items.

E. If any NFN work orders contain an allowance for the removal of debris or health hazards, it is Contractor's responsibility to ensure the items meet the strict definition of debris or health hazards per NFN standards. Contractor acknowledges that: (i) items that do not meet this definition are considered personal property, regardless of their appearance, and; (ii) these items legally belong to the owner and cannot be removed unless authorized by a work order from NFN.

F. Contractor represents that NFN's Zero Tolerance Policy on Theft has been and will be communicated to all Contractor's Agents. Contractor will obtain a signed acknowledgment of NFN's Zero Tolerance Policy on Theft from each Agent; the original of each will be retained by Contractor in its files.

13. This Contract may be terminated by either party at any time in writing, with or without cause. The writing may be delivered by e-mail to the designated contact(s), or facsimile transmission with confirmation retained, Certified Mail, Return Receipt Requested or overnight delivery by a recognized carrier such as FEDEX. Termination by NFN shall not release Contractor from liability for acts or omissions occurring prior to such termination. At NFN's sole option, Contractor may be required to complete all work in progress and be compensated based on the amount(s) agreed to by the parties for those services.

14. Any notices required or permitted herein will be in writing. Notices will be effective upon receipt and may be delivered by e-mail to the designated contact(s), or facsimile transmission with confirmation retained,

5

Certified Mail, Return Receipt Requested or overnight delivery by a recognized carrier such as FEDEX or via the NFN network.

15. NFN and Contractor each represent, warrant and covenant to the other at all times during the Term of this Agreement that the execution, delivery and performance of this Agreement (including Field Technician Memos) by such party:

    A.  has been duly authorized by all necessary corporate action on the part of such party;

    B.  does not conflict with, or otherwise violate the articles of incorporation or by-laws of such party;

    C.  does not violate the terms of, and shall not (with or without the giving of notice, the lapse of time, or both) result in breach of, constitute a default under or otherwise give rise to a right of termination by any other party to any material agreement by which such party is bound;

    D.  does not violate any Law, regulation, rule, judgment or decree of any Governmental Authority having jurisdiction over such party; and

    E.  constitute a valid and legally binding obligation of such party enforceable in accordance with its terms.

16. NFN and Contractor agree to promptly notify the other party in the event that they undergo a change in ownership or control, or significant management or staffing changes that could adversely affect the other party's right or ability to perform the services.

17. The language of this Agreement will in all cases be construed simply, as a whole and in accordance with its fair meaning and not strictly for or against any party. The parties agree that this Agreement has been prepared jointly and has been the subject of arm's length and careful negotiation. Each party has been given the opportunity to independently review this Agreement with legal counsel and other consultants, and each party has the requisite experience and sophistication to understand, interpret and agree to the particular language of the provisions. Accordingly, notwithstanding the general rules of construction, each party agrees that, in the event of an ambiguity or dispute regarding the interpretation of this Agreement, the drafting of the language of this Agreement will not be attributed to either party. Any reference to "days" in this Contract shall mean calendar days unless otherwise explicitly stated.

18. This Contract shall be, in all respects, construed, governed, interpreted and applied pursuant to and in accordance with the laws of the State of New Jersey, including but not limited to the validity of its terms and the interpretation of the rights and duties of the parties hereto.

19. Any controversies of any nature arising under this Contract or the performance of either party pursuant to this Contract, including but not limited to, payments or amounts due, shall be resolved in accordance with the Streamlined Arbitration Rules & Procedures or the Comprehensive Arbitration Rules & Procedures, whichever applies, of Judicial Arbitration and Mediation Services ("JAMS") at its New York City office, presently at 620 Eighth Avenue, 34th Floor, New York, NY 10018, and the judgment award may be entered in any court(s) having jurisdiction thereof. Except for enjoining the other party from attempting to resolve any controversy before any court or tribunal other than JAMS, neither party may institute any lawsuit or seek arbitration or any other form of conflict resolution other than as stated herein. If a party appears before any tribunal other than JAMS for the purpose of compelling the other party to comply with the resolution requirements stated herein, the party having filed the action before such tribunal shall reimburse the other party for all costs and reasonable attorneys' fees incurred to compel arbitration before

JAMS and such amount shall be submitted to JAMS in the form of a Certification(s) and incorporated into any final determination, without objection by the other party except as to the amounts stated for such costs.

20. The parties acknowledge that this Contract (including the Field Technician memos as defined in the section below) sets forth their entire understanding as to its subject matter, supersedes any prior understandings or agreements between them, whether written or verbal and cannot be otherwise changed or modified except in writing signed by the parties, each agreeing to execute such further documents as may be necessary to carry out the intent and provisions hereof. The failure of either party to assert a right or insist on compliance with any term or condition of this Contract shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition.

21. The provisions of this Contract are severable. If any provision of this Contract is determined to be invalid or unenforceable under any controlling body of law, such invalidity or unenforceability shall not in any way affect the validity or enforceability of the remaining provisions nor shall such provision be invalid or unenforceable in any other jurisdiction.

22. This Contract may be executed in one or more counterparts, including the Field Technician memos that may be issued by NFN from time to time and posted on the NFN system, website or Dropbox site and that are herein incorporated by reference and/or by their description on Exhibit B attached hereto, each of which is to be considered an original instrument and all of which together shall be considered one and the same Contract. Receipt of executed pages by electronic format or facsimile shall constitute, have the same force and effect and be as binding, as if executed and delivered by the parties in the presence of each other.

IN WITNESS WHEREOF, the parties acknowledge that they have read, understood and consent to all of the terms stated herein and have duly executed this Contract as of the day and year first above written.

National Management and Preservation
Services, LLC, d/b/a National Field Network

Contractor: _Cavalier Estate Property Services_

By: _____

Name: Christopher Crandell

Chief Operating Officer

By: _George Teichmicky_

Name: _CEO/Pres_

Its: _22 2974925_

Fed Tax ID No: _____

I unconditionally and without limitation guarantee each and every obligation of Contractor in this contract.

[PRINT NAME] _George Teichmicky_       [SIGNATURE] _____

7

# EXHIBIT "F"

## UNITED STATES DISTRICT COURT
### For the
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PU PRESERVATION/RENOVATION, LLC, | ) | Case No. |
| PAUL ULLOA, | ) | |
| | ) | |
| V | ) | |
| | ) | |
| NATIONAL MANAGEMENT & PRESERVATION SERVICES, LLC) | | |
| SHARI NOTT | ) | |
| CHRISTOPHER CRANDELL | ) | |
| DEUTCH AND ASSOCIATES | ) | |
| VICTOR DEUTCH | ) | |
| US DEPARTMENT OF HOUSING & URBAN DEVELOPMENT) | | |
| THE FEDERAL NATIONAL MORTGAGE ASSOCIATION) | | |
| REVERSE MORTGAGE SOLUTIONS, INC | ) | MARCH 19, 2018 |

## COMPLAINT

### I.    THE PARTIES

#### A. The Plaintiffs

1. PU Preservation/Renovation, LLC (PUP) is incorporated under the laws of the state of

   Connecticut (Business Identification no. 1212569) and has its principal place of business

   located at 22 George Street in the Town of Wallingford, CT.

2. Paul Ulloa is an individual, a resident and citizen of the state of Connecticut, and

   owner/sole member of PU Preservation/Restoration, LLC.

#### B. The Defendants

1. Upon information and belief, National Management and Preservation Services, LLC

   (NMPS) is a Delaware corporation doing business in New Jersey as National Field

   Network (NFN), national Field Network Now, LLC, All The Right Movers, LLC,

   collective referred to as a/b/as, with principal place of business located at 4581 Route 9,

   Suite 100, in the Town of Howell, state of New Jersey.

2.  Shari Nott is an individual, a New Jersey resident, founder and organizing member with
    controlling intertest in NMPS and its d/b/as.

3.  Upon information and belief Christopher Crandell is an individual, a New Jersey resident,
    founder and organizing member with controlling intertest in NMPS and its d/b/as.

4.  The United States Department of Housing and Urban Development (HUD) is a federal
    agency with regulatory and supervisory responsibilities over housing contracts.

5.  The Federal National Mortgage Association (Fannie Mae) is a national financial institution
    that finances properties and owns foreclosed properties.

6.  Reverse Mortgage Solutions, Inc, (RMS) is a Texas based subsidiary of Walter Investment
    Management Corp. and a HUD/FHA/Fannie Mae approved servicer of loans and REO
    asset management with license to operate in 48 states.

7.  Deutch and Associates is an entity organized under the laws of New Jersey and engages in
    the practice of law.

8.  Victor Deutch, upon information and belief, is the owner and principal partner in the law
    firm Deutch and Associates.

## II.    BASIS OF JURISDICTION & VENUE

This Court has Jurisdiction based on Diversity of Citizenship, 28 U.S.C. § 1332:

1.  The plaintiffs, Paul Ulloa and PU Preservation/Restoration, are residents and citizens of
    the State of Connecticut.

2.  The defendant, National Management and Preservation Services, LLC is a private
    corporation incorporated in the state of Delaware with operations located in the State of
    New Jersey.

3.  The defendants, Shari Nott, Christopher Crandell, Deutch and Associates, and Victor
Deutch are, upon information and belief, residents of the State of New Jersey.

4.  HUD and Fannie Mae are federal agencies.

5.  The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000).

6.  Connecticut has personal Jurisdiction and is a proper venue pursuant to Conn. Gen. Stat. §52-
59b and §33-1219(f); *International Shoe Co. v. Washington*, 326 U.S. 310 (1945).

### III.    SUMMARY OF THE FACTS

1.  At some time in 2010 or sometime prior, the defendants Nott and Crandell devised a
scheme to enrich themselves doing business in the preservation/restoration industry.

2.  The industry has experienced similar schemes before.

3.  The scheme involves establishing NMPS as the principal holding company for a number of
'shell companies,' (d/b/as) in their home state of NJ.

4.  Through their connections in the industry defendants Nott and Crandell are able to obtain
HUD/FHA and Fannie Mae's seal of approval for these d/b/as.

5.  With said seal of approval, NMPS, through its d/b/as, are eligible for service contracts with
HUD, Fannie Mae, financial institutions and property management companies for
preservation/restoration and property management services throughout the USA.

6.  Upon receipt of said contracts, NMPS and its d/b/as then subcontracts with small businesses
(vendors) to carry out its contractual obligations at deeply discounted rates.

7.  Pursuant to said contracts, NMPS, through its d/b/as, assign vendors "work orders" to
complete specific maintenance/preservation/restoration work at specific locations within
certain geographic areas within and between states referred to as "coverage area."

8.  To successfully carry out their "work orders" each vendor is required to invest money, resources and hire employees.

9.  Upon completion of said "work orders," vendors are required to submit said invoice/report on an electronic platform created and controlled exclusively by NMPS and its d/b/as.

10. Said vendor contract provides for vendors to be paid within Thirty-Five (35) days of submission of the vendor's invoice and report.

11. If payment is not made within thirty-five (35) days, the vendor must submit its claim to an internal process described as "Reconciliation."

12. Said reconciliation process is tedious and the burden is placed solely on the vendor to resubmit every item of its claim.

13. NMPS will not voluntarily correct for any error on its part requiring the vendor to prove said error without access to its records of the vendor's prior submission.

14. As a result, the reconciliation process serves only to unfairly reduce the vendors' claims for compensation and reimbursement of costs.

15. Payment is to be made promptly after reconciliation.

16. However, NMPS will make promises to pay, delay and eventually fail to pay even the undisputed amount owed.

17. Demands for payment by the vendor is met with excuses, threats, intimidation, dilatory tactics by NMPS, it's a/b/as, officers and their attorney.

18. The defendants seek to compel the acceptance of a "take it or leave it" compromise vendors' claim for a fraction of its value.

19. Some vendors, under economic duress, are forced to surrender their claim and accept the steep compromise.

20. Vendors who reject must seek redress through arbitration.

21. Notwithstanding, NMPS and/or its aba refuses to participate in arbitration either voluntarily or upon demand by the vendor.

22. Disputes are left unresolved and the vendors remain uncompensated for their services.

23. Collectively, upon information and belief, the amount in uncompensated labor exceeds a million dollars ($1,000,000).

## IV.    STATEMENT OF CLAIMS

### COUNT ONE:    BREACH OF CONTRACT (PUP v NMPS)

The immediately preceding Paragraphs 1through 23 are herein referenced and incorporated as if fully set forth herein and made a part of this Count One.

24. On or about October 10, 2016, the plaintiff and the defendant, NMPS d/b/a NFN, entered into a vendor contract in which PUP is to provide preservation/renovation field services as assigned from time to time by the defendant. See Exhibit A.

25. Said contract was entered into in the state of Connecticut.

26. Under said contract NMPS, through its d/b/a NFN, is obligated to compensate the plaintiff for its services at the agreed upon rate and within thirty (35) days of receiving the invoice for said services.

27. Between October 2016 and February 2017 NFN assigned PUP over 350 work orders throughout the states of Connecticut, Massachusetts, Rhode Island, and New Hampshire.

28. PUP forgo or cancelled all other work engagement and opportunities, hired employees, entered into loan agreements and agreements with suppliers for materials and equipment, and devoted all its efforts and resources to fulfilling its contractual obligations.

29. Plaintiff submitted timely periodic invoices upon completion of each work order.

30. Said invoices would remain unpaid for periods of time exceeding thirty-five days.

31. Despite timely submission to the reconciliation process, a substantial amount, including undisputed claims, remains unpaid.

32. In February 2017, the total amount owed to the plaintiff in uncompensated labor and reimbursements was approximately $125,000.

33. Despite repeated demands by PUP for payments the defendant has refused to pay the amount owed.

34. On or about October 2, 2017, initiated arbitration proceedings to resolve the dispute in accordance with the Streamlined Arbitration Rules & Procedures of the Judicial Arbitration and Mediation Services (JAMS) as provided in section 19 of the vendor contract.

35. Plaintiff timely paid all required arbitration fees.

36. Despite demands by JAMS, the defendant refused to pay its share of the arbitrator's fee as required.

37. As a result, JAMS terminated the arbitration on February 13, 2018. See Exhibit B.

38. The aforementioned acts and omissions constitute a breach of the vendor contract with the plaintiff in that the defendant: a) failed to make payments as provided; b) failed or refused to arbitrate as provided; c) engage acts of bad faith in violation of the implied covenant of good faith and fair dealing.

39. As a result of said breach the plaintiff suffered and continues to suffer lost income, harm to its reputation, goodwill and creditworthiness; accrue unexpected debts and bank fees; inability to pay creditors, suppliers and employees.

40. Plaintiff seeks to recover damages.

**COUNT TWO:    CONVERSION (PUP v NMPS, NOTT & CRANDELL)**

The preceding Paragraphs 1through 40 are herein referenced and incorporated as if fully set

forth in this Count Two.

41. NMPS received payments from HUD, Fannie Mae and other financial institutions and RMS

    for the services rendered and expenses incurred by the plaintiff.

42. The plaintiff is a direct third-party beneficiary to and possess a right to immediate

    possession of a portion of said payments.

43. Despite demands by the plaintiff, the named defendants have refused to turn over said

    payments.

44. Defendants have retained exclusive possession of said payments for its own use and to

    deprive the plaintiff of its rights therein.

45. Said retention and appropriation of the plaintiff's property is without plaintiff's consent,

    authorization or waiver of rights.

46. Defendant NMPS operates as an instrument of Nott and Crandell who exercises complete

    control over its affairs without the formalities of a corporation.

47. Defendants Nott and Crandell designed, directed and directly participated in and personally

    benefited from the dishonest and unjust scheme to deprive the plaintiff of his property.

48. As a direct result of defendant's wrongful retention and control, the plaintiff has suffered

    and continues to suffer significant financial and reputational harm.

49. The defendants are jointly and severally liable for the plaintiff's damages.

**COUNT THREE: TORTIOUS INTERFERANCE WITH BUSINESS RELATIONSHIPS
(PUP & Paul Ulloa, personally v NMPS, NOTT & CRANDELL)**

The preceding Paragraphs 1through 49 are herein referenced and incorporated as if fully set

forth in this Count Three.

50. In reliance upon its contract with the defendant and in furtherance of its obligations therein, PUP entered into business relationships with suppliers, entities and individuals.

51. Said business relationships are customary and essential to the  preservation/renovation business.

52. Defendant have been operatives in the industry for more than a decade and represents that it is staffed by personnel who possess knowledge and experience of the trade/industry that extends beyond a decade.

53. Accordingly, the defendants knew or should have known of plaintiffs' business relationships.

54. The defendants knew or should have known that the income stream earned by the plaintiff from the contract is essential to maintaining and strengthening said business relationships.

55. It is foreseeable to the defendants that depriving the plaintiff of said income stream poses a substantial risk of causing significant harm to said business relationships.

56. Defendants carelessly or recklessly ignored or consciously disregarded said risk.

57. The deprivation of said property did in fact cause harm to the business and to Paul Ulloa personally.

58. The defendants are jointly and severally liable to the plaintiffs for said harm.

**COUNT FOUR:  FRAUD (PUP V NMPS, NOTT & CRANDELL)**

The preceding paragraphs 1 through 58 are herein referenced and incorporated as if fully set forth in this Count Four.

59. The defendants' acts, omissions and misrepresentations herein described were deliberate and in furtherance of a nationwide scheme to mislead and defraud vendors.

60. The defendants at no time intended to honor their obligations, promises and representations made to the plaintiffs.

61. Said promises, representations and omissions were material to the formation and maintenance of the relationship between the plaintiff and the defendant and the services provided to the defendants.

62. The defendants knew or had reason to believe the representations were false.

63. Nevertheless, the false representations were made with the intent the plaintiffs and others similarly situated rely on said representations.

64. The plaintiffs reasonably relied on said representations to their detriment.

65. The plaintiffs suffered damages as a direct result of their reliance on said representations and omissions.

66. At all times relevant, NMPS was an instrument or alter ego of the defendants Nott and Crandell in carrying out its fraudulent scheme and to inflict injustice upon the plaintiffs and others.

67. The defendants Nott and Crandell designed, directed, personally participated in and benefitted from said scheme.

68. The defendants are jointly and severally liable to the plaintiffs for their damages.

**COUNT FIVE: VIOLATION OF NJ CONSUMER FRAUD ACT (NJ §56:8.1 et seq) &
CT UNFAIR TRADE PRACTICES ACT (CUTPA) (CGS §42-110b et seq.)
(PUP V NMPS, NOTT & CRANDELL)**

The preceding paragraphs 1 through 68 are herein referenced and incorporated as if fully set forth in this Count Five.

69. The defendants, at all relevant times, were engaged in trade and interstate commerce.

70. Said defendants' acts, omissions and misrepresentations herein described were deliberate and in furtherance of a nationwide scheme to mislead and defraud vendors.

71. Said acts and omissions were deceptive, unfair, dishonest, unconscionable and evince a great degree of indifference and callous disregard for the rights of others.

72. Said acts and omissions are characteristic of defendants' business practices.

73. Said acts and omissions have the effect of or is carefully designed with the predatory intent to exploit the labor, resources and services of smaller, unsophisticated and vulnerable business entities throughout the United States for selfish greed.

74. Said business practice is unethical, unscrupulous, oppressive and akin to the inhumane scourge of servitude.

75. Because of the major role the defendants play in the reverse mortgage market nationwide its unfair, deceptive trade practices create a substantial risk to the viability of the federal housing financing institutions and a negative impact on the housing market generally.

76. Said conduct and practice violates NJ §56:8.1 et seq and CGS §42-110b.

77. Said unfair, unconscionable, immoral, unethical, oppressive, unscrupulous practice has caused and continues to cause the plaintiffs substantial ascertainable loss and damages.

78. The defendants are jointly and severally liable to the plaintiff for its damages.

79. The plaintiff seeks to recover damages.

**COUNT SIX: CIVIL CONSPIRACY (PUP V DEUTCH & ASSOC., VICTOR DEUTCH)**

The preceding Paragraphs 1through 79 are herein referenced and incorporated as if fully set forth in this Count Six.

80. Deutch and Associates is a New jersey law firm.

81. Victor Deutch is its principal.

82. The defendants, Deutch and Associates and Victor Deutch, agreed to aid and abet the defendants NPMS, Nott and Crandell, in the fraudulent scheme herein described.

83. Deutsch and Associates and Victor Deutsch participated in the design and implementation of said scheme, particularly organizing the shell companies, making false and representation and frivolous legal claims, engage in threatening acts designed to intimidate vendors and assist NMPS, Nott and Crandell obtain and wrongfully retain property of others.

84. Victor Deutch, as principal, used the entity, Deutch and Associates, as an instrument in his acts to further the fraudulent scheme of NMPS, Nott and Crandell.

85. Victor Deutch personally conspired with others and participated in the design, direction and carrying out of acts in furtherance of the fraudulent scheme herein complained of.

86. As a result of the conspiracy, the plaintiffs suffered damages.

87. Victor Deutch,and Deutch & Associates are jointly and severally liable to the plaintiff for its damages.

**COUNT SEVEN: NEGLIGENT SUPERVISION (PUP vs HUD, Fannie Mae & RMS)**

The preceding Paragraphs 1through 87 are herein referenced and incorporated as if fully set forth in this Count Seven.

88. The named defendants are agencies and/or entities that enter into contracts with the defendant NMPS and its d/b/as to carry out maintenance/preservation and restoration work on foreclosed properties.

89. As a financial institution Fannie Mae and RMS are subject to the Division of Banking, Federal Reserve System Guidance on Managing Outsourcing Risk.

90. Under said guidelines NPMS and its subsidiaries are "service providers."

91. Fannie Mae, RMS and its managers are responsible for ensuring that service providers conduct outsourced business in compliance with applicable laws and regulations.

92. Said responsibilities include due diligence in selection of service providers; oversight and monitoring of service providers.

93. HUD owns foreclosed properties and contracts with entities such as NPMS to maintain, repair, preserve said properties in marketable condition.

94. HUD as a duty of due diligence and to ensure its approved contractors comply with federal laws and regulations and HUD standards.

95. The preservation and restoration industry rely on HUD approval as a certificate of good standing in the industry and is a requirement to obtain such contracts.

96. The defendants HUD, Fannie Mae and RMS failed to carry out their duty of due diligence, supervision and monitoring.

97. The conduct, failures, omissions and practices herein complained of is not new to the industry.

98. Said defendants knew or should have known that said business practices pose a substantial risk of harm to consumers and vendors.

99. Specifically, the defendants are on notice of the harm inflicted to consumers, vendors and the industry by Buczek Corporation, and repeated complaints prior to and after the Buczek matter.

100. The defendants failed to take steps to avoid or limit said risk of harm where a reasonable person in their position would have.

101. Said harm is foreseeable or is discoverable with the exercise of reasonable care.

102. The defendants ignored or disregarded said risk and failed/refused to intervene and take steps, measures to avoid or prevent said harm.

103. The plaintiffs were in fact harmed by said failure of the defendants to intervene and avoid/prevent the acts, omissions, failures of NMPS, its d/b/a, employees, and the instrumentalities under their control and supervision.

104. The plaintiff seeks to recover damages.

**COUNT EIGHT: UNJUST ENRICHMENT**

The preceding Paragraphs 1 through 104 are herein referenced and incorporated as if fully set forth in this Count Eight.

105. The plaintiffs provided valuable service to the defendants for which the plaintiffs expected to receive compensation.

106. The defendants benefitted from said services.

107. The defendants failed/refused to fully and fairly compensate the plaintiffs.

108. By retaining the benefits and refusing to pay compensation, the defendants are enriched at the plaintiffs' expense and to their detriment.

109. It will be inequitable and unconscionable to permit the defendants to retain said benefits without fair and full compensation to the plaintiff.

**V.     RELIEF**

The Plaintiffs prays for one or more of the following forms of relief:

i)      Contract damages;

. ii)     Compensatory Damages;

iii)    Consequential damages;

iv)     Double damages pursuant to CGS §42-110b, et seq:

v)      Treble damages pursuant to NJ §56:8.1 et seq;

vi)     Punitive Damages pursuant to NJ §56:8.1 et seq and/or CGS §42-110b, et seq;

vii)    Attorney's fee and costs pursuant to NJ §56:8.1 et seq and/or CGS §42-110b, et seq;

viii)   Restitution.

**VI.    AMOUNT IN DEMAND**

The amount in demand, exclusive of fees and costs, is more than One Hundred and Fifty

Thousand Dollars ($150,000.00), not inclusive of punitive damages, fees and costs.

**VII.    JURY DEMAND**

The plaintiffs request a Trial by Jury.

**VIII.    CERTIFICATION**

Under FRCP Rule 11, by signing below, I certify to the best of my knowledge, information,

and belief that this complaint: (1) is not being presented for an improper purpose, such as to

harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported

by existing law or by a non-frivolous argument for extending, modifying, or reversing

existing law; (3) the factual contentions have evidentiary support or, if specifically so

identified, will likely have evidentiary support after a reasonable opportunity for further

investigation or discovery; and (4) the complaint otherwise complies with Rule 11.

Date: <u>March 19, 2018</u>

Signed: /s/ ecm ct26687
Elio C. Morgan
Law Office of Elio CC Morgan
Plaintiffs' Attorney
1000 Lafayette Boulevard, 11th Floor
Bridgeport, CT 06604
Tel: 203-333-1122; Fx: 203-332-9896

# EXHIBIT "G"

3/5/2018 4:53 PM
Chris Daniel - District Clerk Harris County
Envelope No. 22952011
By: Walter Eldridge
Filed: 3/5/2018 4:53 PM

CAUSE NO. _____

| | | |
|---|---|---|
| REVERSE MORTGAGE SOLUTIONS, INC., | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | HARRIS COUNTY, TEXAS |
| | § | |
| NATIONAL MANAGEMENT AND PRESERVATION SERVICES, LLC d/b/a NATIONAL FIELD NETWORK, | § | |
| | § | |
| | § | |
| | § | |
| *Defendants.* | § | _____ JUDICIAL DISTRICT |

**PLAINTIFF'S ORIGINAL PETITION AND
APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY
INJUNCTION, PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Plaintiff REVERSE MORTGAGE SOLUTIONS, INC., (hereinafter "Plaintiff" or "RMS"), and files this Original Petition and Application for Temporary Restraining Order, Temporary Injunction, Permanent Injunction and other Equitable Relief complaining of NATIONAL MANAGEMENT AND PRESERVATION SERVICES, LLC d/b/a NATIONAL FIELD NETWORK ("Defendant" or "NFN"), and would respectfully show unto this Honorable Court as follows:

**I.
DISCOVERY CONTROL PLAN**

1.      RMS does not believe any discovery will be required in this action. However, as required by Texas Rule of Civil Procedure 190.1, RMS states that discovery under Level 3 of that Rule, and, pending the entry of an appropriate discovery order, under Level 2 of that Rule, would be appropriate.

2.      RMS seeks non-monetary relief as set forth herein. Therefore, this lawsuit is not subject to the expedited actions process under Rule 169 of the Texas Rules of Civil Procedure.

## II.
## PARTIES

3.      Plaintiff RMS is a Delaware corporation doing business in the State of Texas with its principal office located at 14405 Walters Road, Suite 200, Houston, Harris County, Texas.

4.      Defendant NFN is a Delaware limited liability company and maintains an office at 4581 US Highway 9, Howell, New Jersey. According to the Delaware Secretary of State's records, NFN's registered service agent resigned effective February 12, 2018.  NFN has engaged in business in the State of Texas but, to the best of RMS's knowledge, NFN does not presently maintain a regular place of business in Texas and has no designated agent in Texas on whom service of citation may be made. Accordingly, NFN may be served with process through the Texas Secretary of State at Service of Process, Secretary of State, P.O. Box 12079 Austin, Texas 78711-2079, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044. RMS requests that the Secretary of State immediately forward a duplicate copy of the citation and Original Petition to NFN via certified mail, return receipt requested at its principal address at 4581 US Highway 9, Howell, New Jersey.

## III.
## JURISDICTION AND VENUE

5.      RMS's claims are brought solely under Texas law, and RMS states that it does not bring any claims under any federal laws, statutes, or regulations. The Court maintains jurisdiction over this matter because NFN has conducted significant business in the State of Texas and has substantial contacts to the State of Texas, including, without limitation:

     a.    NFN has contracted with one or more business entities having a principal place of business in the State of Texas;

     b.    NFN has routinely rendered property maintenance and preservation services to numerous real properties located in the State of Texas;

     c.    NFN has executed a services agreement with RMS governed by Texas law and requiring that claims and disputes resolved via an arbitration proceeding in the State of Texas;

     d.    NFN has hired agents and contractors who reside and conduct business in the State of Texas; and

     e.    NFN has maintained employees in the State of Texas.

6.    Venue is proper in Harris County under TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1) because a substantial part of the events or omissions giving rise to this action occurred in Harris County. Alternatively, venue is proper under TEX. CIV. PRAC. & REM. CODE § 15.002(a)(4) because Plaintiff RMS resided in Harris County at the time of the accrual of this cause of action and no other subdivision of § 15.002(a) applies. Additionally, the facts show that the convenience of the parties and the witnesses and the interest of justice would be best served in Harris County, Texas.

## IV.
## FACTUAL BACKGROUND

7.    RMS is a HUD-, Ginnie Mae- and Fannie Mae-approved servicer of residential, reverse-mortgage loans. RMS services loans owned by RMS, and also subservices loans owned by other financial institutions. As part of its business, RMS is responsible for preserving thousands of residential real properties that either are in default and subject to foreclosure proceedings, or

that have previously been foreclosed and are in the process of being prepared or marketed for sale. The number of residential real properties that RMS has responsibility for at a given time typically ranges from ten thousand to twelve thousand.

8.      Until recently NFN was a nation-wide provider of property preservation services to real properties pursuant to agreements with RMS and Fannie Mae.  Examples of the types of services provided by NFN include trash/debris removal, lawn mowing, lock-changing, cleaning, winterization, trimming shrubs, snow removal, installation of smoke detectors, inspections, general repairs, etc.  NFN provided these services to its clients through a network of sub-contractors located throughout the country. NFN recently ceased operations and, upon information and belief, is winding down its business.

### The Master Services Agreement

9.      Effective June 18, 2015, RMS and NFN entered into a Master Services Agreement ("Agreement") governing the nation-wide provision of property preservation services by NFN to the thousands of residential real properties owned or serviced by RMS across the country, including in Texas (the "Properties").  A true and correct copy of the Agreement is attached hereto as **Exhibit A**.  The Agreement provided that it would continue in force until terminated in accordance with the terms of the Agreement.  [Agreement, § 4.1].

10.     The preservation services to be provided by NFN to RMS pursuant to the Agreement were described in a Statement of Work appended to the Agreement as Exhibit B (the "Services").  A true and correct copy of the Statement of Work is attached hereto as **Exhibit B**. The Statement of Work had a one-year term, from July 27, 2015 through July 27, 2016.  The Statement of Work was amended on July 27, 2016 to extend the term for an additional year, until July 27, 2017.  A true and correct copy of Amendment No. 1 to the Statement of Work extending

4

the term through July 27, 2017, is attached hereto as **Exhibit C**. The parties' course of performance continued after July 27, 2017.

11.     During the term of the Agreement, NFN utilized its nationwide network of local subcontractors to perform the Services at the Properties. RMS would submit an electronic work order to NFN requesting Services with respect to a particular Property. NFN would then assign the work order to one or more of its local subcontractors, who would perform the requested Services and invoice NFN. In support of their invoices, NFN's subcontractors would upload to a database maintained by NFN photographic evidence of their performance of the Services in the form of "before" and "after" photos. RMS had access to the photos and documentation in the database through a portal (the "Portal)."

12.     Upon the completion of work by NFN's subcontractors, NFN would submit invoices to RMS for the Services consisting of NFN's actual costs in rendering the Services (i.e., the fees of NFN's subcontractors), plus NFN's "mark-up." The Agreement provides for RMS to pay NFN's invoices for Services satisfactorily performed within sixty (60) days. [Agreement, § 3.2]. For purposes of approving and paying NFN's invoices for the Services, RMS used the Portal to verify and confirm that the Services were in fact performed in accordance with the Agreement.

13.     Subject to and in accordance with HUD's regulations, RMS is entitled to reimbursement from HUD for expenses actually incurred by RMS to preserve the Properties. Accordingly, RMS regularly files claims with HUD for the reimbursement of sums paid by RMS to NFN for the preservation of the Properties. Each claim for reimbursement by RMS to HUD must be accompanied by photographic proof that the Services were actually performed. RMS obtains the support for its HUD claims from the Portal. HUD requires that claims be submitted

5

by RMS to HUD by a date certain. Although it varies depending on the circumstances, RMS is generally required to submit claims for reimbursement to HUD with respect to each Property within six (6) months from the date RMS acquires possession of the Property. If RMS fails to file its claims with HUD before the expiration of the prescribed HUD deadline, RMS is time-barred from obtaining reimbursement from HUD of its cost of preserving a Property.

14.    The data contained in the Portal maintained by NFN is critical to RMS's operations, constitutes "Client Data" under the Agreement, and is the exclusive property of RMS. "Client Data" is defined in the Agreement as "all data and information that [RMS] or any [RMS] Affiliate provides to [NFN] or that otherwise comes into [NFN's] or a [NFN] Agent's possession in providing the Services…." [Agreement, § 1.6].

15.    RMS is the owner of all Client Data, including all of the data housed in the Portal relating to Services rendered pursuant to the Agreement. [Agreement, §§ 1.6, 14.1]. Upon the termination of the Agreement, NFN must "return all Client Data and copies thereof … in a format mutually agreed upon by the Parties at no additional charge." [Agreement, § 14.4(c)].

**NFN's Demise and Termination of the Agreement**

16.    During 2017 (or perhaps much earlier), NFN became financially distressed. The quality of NFN's service began to deteriorate, NFN became non-responsive to RMS's requests and work orders, and increasing numbers of NFN's subcontractors began complaining to RMS that their invoices were not being paid by NFN. Many of NFN's subcontractors demanded payment directly from RMS of their invoices to NFN. On multiple occasions, NFN's subcontractors filed mechanics' liens against RMS's properties due to NFN's non-payment of their invoices, and in many instances RMS has been required to pay or bond-off these mechanics' liens so that contracts for the sale of Properties to third-parties could be consummated.

6

17.    By letter dated November 29, 2017, NFN notified RMS that it was electing to terminate the Agreement pursuant to Section 4.4 of the Agreement.[1]  A true and correct copy of NFN's termination notice is attached here to as **Exhibit D**.

18.    Upon information and belief, NFN laid off the majority of its employees on the same day that it sent notice to RMS of its termination of the Agreement, November 29, 2017.

### The Parties' Arbitrable Disputes

19.    A number of disputes have arisen between the parties as a result of NFN's financial demise and termination of the Agreement.

20.    Upon the termination of the Agreement, NFN is obligated to cooperate with RMS to effectuate an orderly wind down of the Services, to provide RMS with Transition Assistance Services, and if requested by RMS to enter into a Transition Assistance Plan.  [Agreement, § 4.6; Statement of Work, § 1.8].   Without limitation, NFN must return to RMS all of RMS's Client Data, including RMS's data housed in the Portal.  [Agreement § 14.4(c)].

21.    NFN's management has refused repeated requests by RMS's business and IT people to meet to discuss a Transition Assistance Plan, including RMS's need for continued access to the Portal and for time to design and build an internal platform to house the RMS Client Data housed on the Portal going forward.  True and correct copy of the email chain between the parties evidencing these communications is attached hereto as **Exhibit E.**

22.    By letter dated December 15, 2017, NFN's counsel notified RMS that NFN would "immediately close RMS' access to its portal and decline to provide results or photographs for any

---

[1] The termination clause purportedly relied upon by NSN, Section 4.4, provides for termination of the Agreement in the event of a "change in Law."  To date, NFN has failed to identify to RMS what "change in law" serves as the basis of its invocation of Section 4.4.  In any event, and regardless of the validity of NFN's purported termination of the Agreement, RMS no longer desires to continue its relationship with NFN.

7

work completed to date" until RMS "comes current" on NFN's open invoices. A true and correct copy of the December 15, 2017 sent by NFN's counsel is attached here to as **Exhibit F.**

23.    By letter dated December 20, 2017, RMS's Vice President and General Counsel responded to NFN's counsel's letter, and requested NFN to "provide RMS access to its data via the portal through June 30, 2018," to "allow RMS' technology team the time necessary to design and build an internal platform to house and access the RMS data currently housed on the portal." A true and correct copy of the December 20, 2017 sent by RMS's Vice President and General Counsel to NFN's counsel is attached here to as **Exhibit G.**

24.    Following its termination of the Agreement, NFN has submitted thousands of invoices to RMS totaling Five Million Sixty-Six Thousand Five Hundred Ninety-Five and 43/100 Dollars ($5,066,595.43) for "administrative fees," "minimum service charges," "vacant registration admin fees," "minimum service charges," and other "soft" charges dating back for months, which do not constitute Services under the Statement of Work (the "Disputed Invoices"). The volume and dollar amount of the Disputed Invoices is unprecedented in the history of the parties' relationship and course of dealings. Additionally, RMS had never before paid such soft charges to NFN. A true and correct copy of NFN's counsel's letter dated February 20, 2018 demanding payment of $5,066,595.43 (excluding the referenced excel spreadsheet) is attached hereto as **Exhibit H.**

25.    Based on its initial review of the Disputed Invoices to date, RMS denies that it is indebted to NFN for most if not all of the Disputed Invoices.

26.    Additionally, due to NFN's failure to pay its subcontractors as required by the Agreement, many of NFN's subcontractors are now demanding payment from RMS and/or filing mechanics' liens against RMS's Properties (the "NFN Subcontractor Claims"). The failure by

NFN to pay its subcontractors constitutes a breach of the Agreement.  [Agreement, §§ 1.28, 7.4, 18].   NFN agreed to indemnify RMS against its non-performance of its duties under the Agreement, including without limitation NFN's failure to pay the subcontractors engaged by NFN to perform the Services.  [Agreement, § 12.2(c)].   RMS has made demand upon NFN to defend and indemnify RMS against the mounting NFN Subcontractor Claims.

27.      RMS asserts that the parties' claims and disputes arising under or related to the Agreement are required to be resolved pursuant to the alternative dispute resolution provisions contained in the Agreement, including arbitration in Texas[2]   [Agreement, § 16].

### NFN's Wrongful Closure of the Portal and
### RMS' Need for Emergency Equitable Relief

28.      On or about February 16, 2018, NFN unlawfully terminated RMS's access to RMS's data housed in the Portal in violation of RMS's rights in a transparent and blatant effort to extort the immediate payment by RMS of NFN's Disputed Invoices.

29.      The RMS Client Data housed in the Portal belongs to RMS and is critical to RMS's operations.

30.      NFN's termination of RMS's access to the Portal is a violation of the Agreement, amounts to a wrongful taking of RMS's property, and is subjecting RMS to imminent and irreparable harm.  Without access to the Portal, RMS is unable to conduct its operations, including submitting properly-supported claims for reimbursement to HUD for expenses incurred by RMS to preserve the Properties (i.e., the Services).

---

[2] The Agreement provides for the resolution of disputes relating to the Agreement via binding arbitration in Texas. Without limitation, the arbitration clause in the Agreement provides that the arbitration will be conducted by a judge or attorney with at least ten years practice in the financial services industry and applying the substantive Law of the state of Texas.  [Agreement, § 16.2].

31.     The proof required by HUD to be included with each RMS claim for reimbursement to HUD is housed in the Portal.  Moreover, RMS is subject to strict deadlines imposed by HUD for the submission of claims for the reimbursement of expenses incurred by RMS for the preservation of the Properties.  Without access to the Portal, RMS is unable to timely file with HUD its claims for reimbursement of preservation costs, which claims will be forever time-barred if not submitted by RMS within the strict time periods prescribed by HUD.

32.     NFN has refused RMS's requests to reopen the Portal.

33.     RMS files this Petition seeking equitable relief in the form of injunctive relief commanding NFN to immediately restore RMS's access to the Portal and to allow RMS the time necessary to design and build, at its own expense, an internal platform to house and access the RMS data currently housed on the portal.  RMS also seeks the Court's assistance to compel NFN to avail itself to the dispute resolution process that the parties agreed to in the Agreement, including, without limitation, an arbitration proceeding in Texas, with respect to any substantive disputes related to the Agreement.

34.     RMS's Petition to this Honorable Court is neither prohibited by, nor subject to, the arbitration clause in the Agreement. The parties expressly agreed in the Agreement that the parties' right to commence a court action seeking injunctive relief or other equitable relief would be preserved and would not be prohibited by the alternative dispute resolution provisions contained in the Agreement.  Specifically, the Agreement provides as follows:

> This Section **shall not limit the rights of any Party to obtain equitable remedies at any time from a court of competent jurisdiction** before, after, or during the pendency of any informal dispute resolution, arbitration or other proceeding.

> [Agreement, § 16.1].

\* \* \*

The Parties have knowingly chosen arbitration as an alternative to proceedings in court and they specifically waive their rights to proceed by any means before a court otherwise having jurisdiction of any dispute between them, ***except to the extent necessary for injunctive relief or other equitable relief.***

[Agreement, § 16.2].

35.     RMS reserves all rights, remedies, claims, counterclaims, causes of action, defenses and damages related to and arising from NFN's acts and omissions under and related to the Agreement, which rights, remedies, claims, counterclaims, causes of action, defenses and damages are governed by and subject to the arbitration clause contained in the Agreement. By filing this Petition, RMS does not waive or release any of its rights, remedies, claims, counterclaims, causes of action, defenses and damages related to this matter or otherwise. Rather, the relief sought by RMS in this Petition is limited solely to obtaining injunctive and other equitable relief against NFN for its unlawful conduct that is subjecting RMS to immediate and irreparable harm. RMS is seeking this Court's assistance merely to preserve the status quo until the parties' substantive disputes can be lawfully and justly resolved via arbitration in accordance with the Agreement.

## V.
## APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION AND PERMANENT INJUNCTION

36.     RMS repeats and re-alleges the allegations of the preceding paragraphs of this Original Petition as if fully set forth herein.

37.     RMS requests that this Court enter a Temporary Restraining Order ("TRO") and Temporary Injunction and Permanent Injunction as permitted by TEX. CIV. PRAC. & REM. CODE § 65.001 *et seq.,* commanding NFN to restore RMS's access to the Portal for a period of six (6) months in a form and substance identical to the access enjoyed by RMS prior to NFN's termination

11

of the Agreement; and to reasonably cooperate with RMS and its agents to transition and export RMS's data in the Portal to a new platform to be designed and constructed by RMS at RMS's expense.

38.    As a direct and proximate result of NFN's conduct as described above, RMS is suffering irreparable harm from its loss of access to the Portal which is essential to RMS's operations and RMS's ability to obtain reimbursement from HUD for the preservation of the Properties.

39.    RMS has no adequate remedy at law and is suffering immediate, imminent, irreparable harm caused by NFN's unlawful conduct. If NFN is permitted to continue wrongfully depriving RMS of its right to access the Portal, and any relief that this Court or any arbitrator could award would not adequately remedy the injury to RMS. Therefore, the only adequate, effective, and complete relief to RMS is to require NFN to immediately restore RMS's access to the Portal.

40.    RMS enjoys a substantial likelihood that it will prevail on the merits of its claims and a probable right to relief. The equities in this matter weigh heavily in favor of RMS and the issuance of a TRO, Temporary Injunction, and Permanent Injunction. Further, the magnitude of the injury being suffered due to NFN's unlawful conduct heavily outweighs whatever hardship NFN could allege or prove from being restrained as requested below. Indeed, RMS asserts that NFN will suffer no prejudice whatsoever if it is required to restore RMS's access to its RMS's data housed in the Portal. Moreover, the granting of injunctive relief herein would not adversely affect public policy or public interest in any manner.

41.    NFN had no right to close RMS's access to the Portal to the detriment of RMS leaving RMS with no ability to obtain payment from HUD. NFN will not be harmed by issuance

of a TRO and temporary injunction, and justice and equity warrants the waiving of a bond. RMS however, is willing to post a bond in support of the injunctive relief sought.

42.    Given the foregoing, RMS requests a TRO against NFN and its agents, servants, employees, independent contractors, attorneys, representatives, and those persons in active concert or participation with NFN that receive actual notice of the order by personal service or otherwise, to immediately restore RMS's access to the Portal for a period of six (6) months consistent with and identical to the form and substance of the access enjoyed by RMS prior to NFN's termination of the Agreement, and to cooperate with RMS's efforts to transition and export RMS's data housed in the Portal to a new platform to be designed and constructed by RMS at RMS's expense.

43.    RMS further seeks a Temporary and/or Permanent Injunction against NFN and its agents, servants, employees, independent contractors, attorneys, representatives, and those persons in active concert or participation with NFN that receive actual notice of the order by personal service or otherwise, from depriving RMS of access to the Portal for a period of six (6) months from the date of the TRO entered by this Court or interfering with RMS's efforts to extract and export RMS's data from the Portal to a new platform to be designed and constructed by RMS at RMS's expense.

**VI.**
**SPECIFIC PERFORMANCE COMPELLING ARBITRATION; RESERVATION OF JURISDICTION TO ENFORCE ARBITRATION AWARD**

44.    RMS repeats and re-alleges the allegations of the preceding paragraphs of this Original Petition as if fully set forth herein.

45.    NFN is contractually obligated under the Agreement to seek resolution of any and all disputes with RMS related to the Agreement, including the Disputed Invoices, via arbitration in accordance with the provisions of the Agreement. [Agreement, § 16].

13

46.     In addition to the injunctive relief requested hereinabove restoring RMS's access

to the Portal, RMS seeks an Order compelling, directing and commanding NFN to seek resolution

of the Disputed Invoices, in accordance with the terms of the arbitration clause contained in the

Agreement, along with any and all other disputes and claims related in any way to the Agreement.

47.     Additionally, RMS requests this Court to expressly retain jurisdiction over this

matter to enforce any future arbitration award that might be entered under the Agreement.

## VII.
## REQUEST FOR DISCLOSURE

48.     Under Texas Rule of Civil Procedure 194, Defendants are requested to disclose

within fifty (50) days of service of this request, the information or material described in Texas

Rule of Civil Procedure 194.2 (a)–(l).

## VIII.
## RULE 193.7 NOTICE

49.     Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, RMS hereby gives

actual notice that any and all documents produced by any party will be used at any pretrial

proceeding and/or the trial of this matter.

## IX.
## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** RMS respectfully prays that NFN be cited

to appear and answer herein, and:

- That the Court grant a Temporary Restraining Order in the form attached hereto as **Exhibit I** immediately restoring RMS's access to the Portal, and that, following notice and hearing, a Temporary Injunction be issued;

- That upon final trial on the merits that RMS be awarded a permanent injunctive relief and such other equitable relief as the Court finds just and appropriate;

14

- That NFN be directed and commanded to seek resolution of the Disputed Invoices, and any and all other disputes related to the Agreement that are subject to arbitration clause, via arbitration in accordance with the terms of the parties' Agreement; and

- That the Court retain jurisdiction over this matter and the parties hereto, for purposes of enforcing any resulting arbitration award that might be entered in the future related to the parties' disputes.

Dated this 5th day of March, 2018.

Respectfully submitted,

BRADLEY ARANT BOULT CUMMINGS, LLP


/s/ Ryan T. Kinder
JAMES A. COLLURA, JR.
Texas Bar No. 24044502
jcollura@bradley.com
RYAN T. KINDER
Texas Bar No. 24065560
rkinder@bradley.com
600 Travis, Suite 4800
Houston, Texas 77002
Telephone: 713-576-0300
Facsimile:  713-576-0301

ATTORNEYS FOR PLAINTIFF


OF COUNSEL:
N. Christian Glenos, Esq.
BRADLEY ARANT BOULT CUMMINGS, LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
(205) 521-8000

# EXHIBIT "H"

CAUSE NO. 2018-14785

| | | |
|---|---|---|
| REVERSE MORTGAGE SOLUTIONS, INC., | § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § | |
| vs. | § § | HARRIS COUNTY, TEXAS |
| NATIONAL MANAGEMENT AND PRESERVATION SERVICES, LLC d/b/a NATIONAL FIELD NETWORK, | § § § § | |
| *Defendants.* | § | 152nd JUDICIAL DISTRICT |



## <u>CONSENT TEMPORARY RESTRAINING ORDER</u>

COME NOW the Parties to his action and stipulate as follows:

Defendant, NATIONAL MANAGEMENT AND PRESERVATION SERVICES, LLC d/b/a NATIONAL FIELD NETWORK ("<u>Defendant</u>"), and plaintiff, REVERSE MORTGAGE SOLUTIONS, INC. ("Plaintiff"), agree as follows with respect to Plaintiff's Application for Temporary Restraining Order:

1. Defendant accepts service of Plaintiff's Petition, but reserves all defenses or jurisdictional objections to this Action, none of which are waived by Defendant's accepting service of Plaintiff's Petition.

2. Plaintiff and Defendant agree that Defendant shall file an answer or other responsive pleading no later than April 16, 2018.

3. Defendant will preserve and safeguard Plaintiff's "Client Data," as that was defined in the parties' Master Services Agreement dated June 18, 2015 (the "MSA"); shall immediately reopen Plaintiff's access to Plaintiff's Client Data via the PL-FS Portal; and shall maintain that access for Plaintiff through 5PM on April 16, 2018 (the

"Transition Period"), granting to Plaintiff and its affiliate, REO Management Solutions ("REO"), and their third-party contractors who had access to the Client Data via the PL-FS Portal prior to December 1, 2017, the same access and use that they were previously afforded prior to December 1, 2017.

4. Plaintiff will not terminate Defendant's ability to submit electronic invoices to Plaintiff and REO via REO Central and Navigator through 5 PM on April 16, 2018.

5. Plaintiff and Defendant, including their authorized information technology personnel, will immediately begin cooperating and conferring in good faith (including, if requested by Plaintiff, meeting onsite at Defendant's office) to effectuate the transfer by Plaintiff of its Client Data to Plaintiff or its designee. During the Transition Period, Defendant shall not be required to render any services to Plaintiff other than granting Plaintiff access to its Client Data, and cooperating and conferring with Plaintiff to effectuate the transfer by Plaintiff of Plaintiff's Client Data to Plaintiff or its designee.

6. Defendant represents that Plaintiff's Client Data continues to be housed on a server with Abacus Solutions LLC, at 1190 Kennestone Cir., Suite 120, Marietta, GA 30066 ("Abacus"), at a cost of approximately Five Thousand and 00/100 ($5,000.00) dollars per month. Defendant shall provide Plaintiff with a copy of any agreement(s) with Abacus relating to the housing of Plaintiff's Client Data and proof of Abacus's fee for same. Plaintiff shall pay, directly to Abacus, Defendant's attributed share of the cost to house Plaintiff's Client Data during the Transition Period, not to exceed Five Thousand and 00/100 ($5,000.00) dollars per month.

7. This Consent TRO may be extended by mutual agreement of the parties, or by Order
of the Court.

8. Plaintiff and Defendant reserve all rights and remedies and no waivers of any rights
or remedies by either shall be implied by this Consent Order unless specifically stated
herein.

ORDERED, ADJUDGED AND DECREED:

SIGNED this _15_ day of March, 2018.

_____
Honorable Bill Burke
JUDGE PRESIDING

We hereby consent to form and entry of the within Order.

Dated this _15th_ day of March, 2018.

**ATTORNEYS FOR DEFENDANT**

NATIONAL MANAGEMENT AND
PRESERVATION SERVICES, LLC d/b/a
NATIONAL FIELD NETWORK

DEUTCH & ASSOCIATES LLC

By: _____
VICTOR A. DEUTCH, Esq.*
New Jersey Bar No. 008891973
vdeutch@deutchassociates.com
1000 U.S. Highway 9 North, Ste 204
Woodbridge, NJ 07095
Telephone: 732-636-4200 X 208
Facsimile: 732-636-7395
*Not admitted in Texas

3

ATTORNEYS FOR PLAINTIFF

BRADLEY ARANT BOULT
CUMMINGS, LLP

JAMES A. COLLURA, JR.
Texas Bar No. 24044502
jcollura@bradley.com
RYAN T. KINDER
Texas Bar No. 24065560
rkinder@bradley.com
600 Travis, Suite 4800
Houston, Texas 77002
Telephone: 346-310-6009
Facsimile:  346-310-6109

OF COUNSEL:
N. Christian Glenos, Esq.*
BRADLEY ARANT BOULT CUMMINGS, LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
(205) 521-8000
*Not admitted in Texas

4